## UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| Communities for Equity, et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | No. 1:98CV479 |
| | ) | Hon. Richard A. Enslen |
| Michigan High School Athletic | ) | |
| Association, Inc., | ) | |
| | ) | |
| *Defendant* | ) | |
| | ) | |
| The Michigan High School Tennis | ) | |
| Coaches' Association, Amy Christman, as | ) | |
| Next Friend of L.C., Richard D. | ) | |
| Friedman, as Next Friend to R.A.F., | ) | |
| and Rafat Rizk, as Next Friend to M.R. | ) | |
| | ) | |
| *Applicants for Intervention* | ) | |

**INTERVENOR'S COUNSEL:**

**Richard D. Friedman (P42575)**
**Lead Counsel**
625 South State Street
Ann Arbor, Michigan 48109
Telephone:  (734) 647-1078
Facsimile: (734) 647-4188
E-mail: rdfrdman@umich.edu

**Stuart H. Deming (P27627)**
**Local Counsel**
Deming PLLC
229 E. Michigan Ave, Ste 445
Kalamazoo MI 49007
Telephone: (269) 382-8080
Facsimile: (269) 382-8083
E-Mail: stuart.deming@deminggroup.com

**Garry L. Walton (P31199)**
**Local Counsel**
Garry L. Walton PC
229 E Michigan Ave, Ste 445
Kalamazoo MI 49007
Telephone (269) 383-3434
Facsimile (269) 383-2997
E-mail: glwalton@charterinternet.com

## EXPEDITED CONSIDERATION AND ORAL ARGUMENT REQUESTED

## MOTION OF THE MICHIGAN HIGH SCHOOL TENNIS COACHES' ASSOCIATION, AMY CHRISTMAN, AS NEXT FRIEND TO L.C., RICHARD D. FRIEDMAN, AS NEXT FRIEND TO R.A.F., AND RAFAT RIZK, AS NEXT FRIEND TO M.R., TO INTERVENE, FOR MODIFICATION OF REMEDIAL ORDER, AND OTHER RELIEF

Now come the applicants, Michigan High School Tennis Coaches' Association, Amy Christman, as next friend to L.C., Richard D. Friedman, as next friend to R.A.F.., and Rafat Rizk, as next friend to M.R.., by and through their attorneys, Richard D. Friedman, Garry L. Walton, and Deming PLLC, and respectfully request that (1) applicants be permitted to intervene in this action pursuant to Fed. R. Civ. P. 24, (2) the remedial order of this Court of November 8, 2002 be modified so that the girls' tennis season shall remain in the fall and the boys' tennis season shall remain in the spring, and (3) the Court enter such other order as may be necessary to ensure the orderly disposition of this matter.

Because of the need for speed in resolution of this matter, applicants request expedited consideration and oral argument.

This motion is supported by affidavits of the following persons:

(1) Matt Boven, head coach of the Kalamazoo College women's tennis team and of the girls' varsity tennis team at Mattawan High School, testifying to reasons why the fall is the better season for girls' tennis in Michigan.

(2) Nancy Brissette, President of MHSTeCA, President-elect of the Michigan High School Coaches' Association, and coach of the varsity tennis teams at Essexville Garber High School, testifying primarily to reasons why the fall is the better season for girls' tennis in Michigan.

(3) Karen Caine, coach of the girls' varsity at Adrian High School, testifying to reasons why the fall is the better season for girls tennis in Michigan.

(4) Amy Christman, one of the applicants, testifying among other matters to reasons why the switch of tennis seasons will hurt her daughter's interests.

(5) Richard Friedman, one of the applicants and lead counsel for the applicants, testifying

among other matters to reasons why the switch of tennis seasons will hurt his daughter's interests, to facts bearing on the timeliness of the present motion, and to communications with the parties related to the motion.

(6) Poonam Kumar, a law student, assembling data supporting the conclusion that the fall is the better season for girls' tennis in Michigan.

(7) Rafat Rizk, one of the applicants, a resident of Illinois until 2006 and now a professor at the University of Michigan Medical School, testifying among other matters to medical and other reasons why the switch of tennis seasons will hurt his daughter's interests,

Dated: April 12, 2007

Respectfully submitted,

s/Richard D. Friedman
Richard D. Friedman
Lead Counsel
625 South State Street
Ann Arbor, Michigan 48109
Telephone:  (734) 647-1078
Facsimile (734) 647-4188
E-mail: rdfrdman@umich.edu

s/Garry L. Walton
Garry L. Walton
Local Counsel
Garry L. Walton PC
229 E Michigan Ave, Ste 445
Kalamazoo MI 49007
Telephone (269) 383-3434
Facsimile (269) 383-2997
E-mail: glwalton@charterinternet.com

s/Stuart H. Deming             
Stuart H. Deming
Local Counsel
Deming PLLC
229 E.  Michigan Ave, Ste 440
Kalamazoo MI 49007
Telephone: (269) 382-8080
Facsimile: (269) 382-8083
E-mail: stuart.deming@deminggroup.com

\karen\friedman\motion.wpd

# UNITED STATES DISTRICT COURT FOR
# THE WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| Communities for Equity, et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | No. 1:98CV479 |
| | ) | Hon. Richard A. Enslen |
| Michigan High School Athletic | ) | |
| Association, Inc., | ) | |
| | ) | |
| *Defendant* | ) | |
| | ) | |
| The Michigan High School Tennis | ) | |
| Coaches' Association, Amy Christman, as | ) | |
| Next Friend of L.C., Richard D. Friedman, | ) | |
| as Next Friend to M.R., | ) | |
| | ) | |
| *Applicants for Intervention* | ) | |

**INTERVENOR'S COUNSEL:**

**Richard D. Friedman (P42575)**
**Lead Counsel**
625 South State Street
Ann Arbor, Michigan 48109
Telephone:  (734) 647-1078
Facsimile: (734) 647-4188
E-mail: rdfrdman@umich.edu

**Stuart H. Deming (P27627)**
**Local Counsel**
Deming PLLC
229 E. Michigan Ave, Ste 445
Kalamazoo MI 49007
Telephone: (269) 382-8080
Facsimile:  (269) 382-8083
 E-mail:  stuart.deming@deminggroup.com

**Garry L. Walton (P31199)**
**Local Counsel**
Garry L. Walton PC
229 E Michigan Ave, Ste 445
Kalamazoo MI 49007
Telephone (269) 383-3434
Facsimile (269) 383-2997
E-mail: glwalton@charterinternet.com

# AFFIDAVIT OF MATT BOVEN
# IN SUPPORT OF MOTION TO INTERVENE

**AFFIDAVIT OF MATT BOVEN**

MATT BOVEN, being duly sworn, deposes and says:

*Introduction*

1. I submit this affidavit in support of the motion of the Michigan High School Tennis Coaches' Association (MHSTeCA) and of parents of female tennis players to intervene in this action.

2. I was named head coach of the Kalamazoo College women's tennis team in August of 2006.

3. I have been the coach of girls' varsity tennis teams at Mattawan High School since 1999. I also served as the varsity boy's tennis coach at Hackett Catholic Central High School since the winter of 2004, earning MHSAA Division Four Regional Coach of the Year honors in 2004 and 2005.

4. I am familiar with the attitudes of coaches, parents, and players in the Michigan high school tennis community towards the prospect of a switch of tennis seasons. MHSTeCA's Board of Directors, which has 58 members distributed among the eight districts of the state, has voted unanimously in favor of keeping girls' tennis in the fall. It has approved the participation of MHSTeCA in this litigation. I believe the views stated here – that fall is a far better season than spring for high school tennis in Michigan and that a change of the girls' season from the fall to the spring would be harmful to girls.– are shared nearly unanimously by Michigan high school tennis coaches and by the overwhelming majority of parents and players. Having coached extensively both in the fall and in the spring, I can say unequivocally that the fall is the better season, especially for girls.

2

*Weather*

5.   The weather is significantly worse in the spring than in the fall.  It is much colder in the spring than in the fall.  There is much more precipitation in the spring than in the fall.  Climate mitigates against flipping girls' tennis from fall to spring.

6.   *Precipitation* – In most sports in which Michigan high school students compete outdoors  competition can be held in rain or snow, often even if precipitation is heavy.  In high school, with rare exception, tennis competition is outdoors.   Tennis courts become dangerously slippery when wet.  Even a light drizzle causes at least suspension of a match.  If precipitation persists, the match must be canceled.  Even if the precipitation ends quickly, that does not mean the match can continue; courts must first be dried, and  in cool weather, this can take hours.

7.   *Cold* – Tennis is vulnerable to cold weather because, unlike other outdoor sports played by Michigan high school athletes, it requires unique manual dexterity, is played continuously, with only short breaks, *and* it "cannot" be played well with gloves.

8.   The fall season begins in warm summer weather.  Even at its end in October, the weather is relatively warm – and as I discuss below, if the weather is poor at the end of the season -  when end-of-year tournaments are played - that is of secondary importance.  A spring season, by contrast, begins in March, when the weather is still cold.  Even in early and mid April, the temperature is cool, and – frequently – intolerably cold.  (This year in April of 2007 for instance, we have had snow on at least seven days.)

9.   *Indoor Courts*  - Indoor courts are not a satisfactory alternative from September through May - except for end-of-year tournaments.  Virtually all high school tennis practices and competitions scheduled between Labor Day in early September and Memorial Day in late May

must be held outside.  During this period and especially when practices and competitions are scheduled (afternoons and weekends) almost all indoor courts are reserved on a regular basis for other users, like club members and collegiate teams.

10.  If indoor courts are available, they are expensive.

11.  Some schools resort to using gymnasiums for indoor practices.  Practice time there is limited.  Gym floors are an unsatisfactory substitute for a court surface.  Moreover, most gyms are not set up with nets and tennis lines and gyms do not offer nearly the space that a set of tennis courts does.

12.  As for competitions, a given community virtually never has sufficient available indoor courts for a match or tournament.   Bottom line: *If a match or tournament cannot be played outside, it "cannot" be played.*

13.  The one significant exception to that truism is end-of-year tournaments.   They are played typically during the ordinary school day, when indoor courts are more readily available. They are also played in cities with sufficient capacity to move the tournaments inside if necessary.  Because of the importance and one-shot nature of these tournaments, available courts can be found.

*Summary* – Weather affects all sports played outside.  Bad weather most adversely impacts tennis.  Weather in the fall is superior to that in the spring.  Moving girls' tennis from its current fall season over to spring favors "<u>boys</u>".

### *Opportunities for Preparation*

14.  The opportunities to prepare for the fall season are superior to those for the spring. For nearly two months before the fall season begins, students are out of school on summer

vacation.  The weather is warm, they can play outside, courts are plentiful, and a wealth of instructional programs – camps and clinics – and of tournaments is available.  It is relatively easy for a girl to begin the season well prepared.  Advantage belongs to the team with the fall season. Right now – the girls.  Switch it, and it favors the guys.

15.  I run a summer tennis program many local high school girls participate in which assists in the preparation of fall tennis.

16.  The period before the spring season, like the season itself, occurs entirely during the school year, while students are occupied with their studies, and in dead of winter, precluding outside play. For many students, indoor play is prohibitively expensive. In any event, most students cannot feasibly play indoors for more than a small amount of time per week. Tournaments and instructional programs are considerably sparser than during the summer. Right now boys are, therefore, more likely than girls to come to tryouts poorly prepared.

### *Season Length*

17.  In the Lower Peninsula, the spring tennis season is about 14 days longer than the fall season.  However, the *effective* season is longer in the fall than in the spring.  With fall high school tennis, girls are ready to start the season well prepared.  The weather is warm, and it remains warm enough throughout the 69-day season.  As a result, many teams effectively compete from the first permissible date until the last.  By contrast, boys' competition cannot begin until well after the start of the nominal season in the first half of March.  It is much harder for them right now to begin the season prepared, and the weather precludes outdoor competition

for several weeks.  As a result, most teams do not schedule competitions before several days of April have passed, when there are fewer than 60 days left in the season.  Even then, weather conditions are less than optimal.  Not until the last half of April - when there are fewer than 50 days left in the season – does the average temperature reach as high as the lowest level to which it drops in the fall season.  Furthermore, most schools have spring-break during the season; typically, this is nine or ten calendar days spanning Easter weekend, and it is tough to schedule competitions during this time, with many families on vacation.

### *Minimizing Conflicts*

18.  Many student-athletes play more than one sport – but they cannot feasibly do so in one season.  If a student's two favorite sports are played in the same season, she must choose. The more crowded a given season is with girls' sports, the more girls will face this conflict.  Data assembled by counsel confirm what those in the tennis community have long believed to be true: The spring is overcrowded for girls' sports relative to the fall.  Switching the girls' basketball and volleyball seasons will likely have little impact.  Moving girls' golf into the fall will mitigate the situation to some extent.

But moving girls' tennis into the spring would severely cramp and compound the situation.  A few girls would benefit from the switch.  But far more girls who now are able to play their two favorite sports - tennis in the fall and another (soccer, softball, or track and field) in the spring  - would have to give up one or the other.

In my experience tennis and soccer especially butt heads on this count.  If women's tennis switches to spring,  I estimate with women's soccer also in the spring that I will lose six

varsity girls tennis players and six junior varsity tennis players. This erosion of members could jeopardize our junior varsity program altogether.

### *Impact on College Tennis and Scholarship Prospects*

19. I understand that two out-of-state witnesses who professed no experience with or expertise with respect to Michigan high school tennis testified that tennis players have a better chance for scholarships if the high school season is in the spring than if it is in the fall. I believe the argument is utterly ungrounded in the realities of Michigan tennis. In truth, setting the high school tennis season in the fall *improves* a player's chance of getting a scholarship.

20. *First*, impact on scholarship prospects is not a concern for the majority of high school tennis players in Michigan. Few players have any realistic chance of receiving an athletic scholarship.

21. *Second*, most girls across the nation, and in the states near Michigan, play high school tennis "in the fall". Even if playing high school tennis in the fall theoretically put a player at a disadvantage for scholarship prospects, she would not be disadvantaged against residents in neighboring states.

22. *Third*, even as compared to girls who play high school tennis in the spring, Michigan girls are not in fact disadvantaged.

23. The summer USTA tournaments are far from the exclusive consideration for college recruiters. Performance in high school competition also plays a role in that consideration, albeit minor.

24. Playing on a high school team is not optimal preparation for elite tournaments. Many high-ranked players of high school age in Michigan, in fact, decline to play on their high school

teams because they feel doing so will distract them from more intense preparation and competition.   There is also an MHSAA rule precluding a player from participating in more than two USTA tournaments during the high school season.  Currently there are more USTA tournaments available in the spring than fall which is an argument for high school women's tennis to remain in the fall.  If the seasons were switched, the practice would probably become more prevalent among top-ranked girls than it is among boys, because at the upper levels, competition in girls' high school tennis in the state is spread thin; a scholarship candidate is far more likely to find a tough match in a spring USTA tournament than among her teammates or in interscholastic competitions.

25.  *Fourth*, so far as I am aware, the trial witnesses offered only speculation, and no proof, that playing in the fall disadvantages Michigan girls seeking scholarships. That is hardly surprising. The experience of Michigan coaches, as represented by MHSTeCA, is that the proposition is simply not true.

26.  *Fifth*, two significant factors make the fall a *better* season for players seeking college scholarships.  (1) Because college tennis is primarily a spring sport, coaches and other scouts have much more time in the fall to evaluate potential recruits.  College coaches like myself cannot easily schedule scouting high school players in the spring during their own women's tennis season.  We do have more time available to observe high school competition in the fall. (2) The fall season, but not the spring season, is played before commitments by colleges and by students must be made. Accordingly, fall players have an extra season in which to be evaluated.

***Adequacy of Representation***

27.  Fall is the better season for girls' high school tennis in Michigan.  Virtually anybody with extensive experience in Michigan high school tennis would say the same thing.  Many men's tennis coaches are excited about gaining the preferred season.  In tennis the score becomes:  "Advantage, Men…"

28.  MHSTeCA does not have the funds to hire counsel to present the points made in this affidavit.  Not until the father of a tennis-playing girl offered his services as counsel *pro bono* or similar *pro bono* local counsel volunteered have we been able to present the reasons why fall is the preferable season.

***Conclusion***

29.  The situation is clear beyond any genuine doubt: Girls who play fall high school tennis in Michigan have the optimal situation right now - playing in the better weather, and not having to share limited facilities with boys.  Any change from that situation works serious detriment to the best interests of tennis-playing girls.

30.  It was Hippocrates who formulated centuries ago – the first law of medicine:  "Do no harm."  His words ring true with the prospect of switching women's high school tennis from fall to spring – the philosophical caveat:  "Do no harm."

Respectfully submitted,

____s/ Matt Boven_____
Matt Boven

Sworn to before me in Kalamazoo County, Michigan
on April  12 , 2007 by Matt Boven.

____s/ Julia M. Jankowiak_____
Julia M. Jankowiak              Notary Public
State of Michigan, County of Kalamazoo
My commission expires:  8/20/13
C:\Documents\Karen\Friedman\Boven affidavit.doc

UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF MICHIGAN

---

COMMUNITIES FOR EQUITY, ET AL.,

                              *PLAINTIFFS,*          :

                  v.                              No. 1:98CV479

                                           :

MICHIGAN HIGH SCHOOL ATHLETIC ASSOCIATION, INC.,

                              *DEFENDANT.*        :

---

### AFFIDAVIT OF NANCY BRISSETTE

NANCY BRISSETTE, being duly sworn, deposes and says:

***Introduction***

1. I submit this affidavit in support of the motion of the Michigan High School Tennis Coaches' Association (MHSTeCA) and of parents of female tennis players to intervene in this action.

2. I am the coach of boys' and girls' varsity tennis teams at Essexville Garber High School, a Division IV, Class B school. I coached the girls' junior varsity team in 1995 and 1996, and have coached the girls' varsity team since then, beginning with the 1997 season. I coached the boys' junior varsity team from 1998 through 2000, and since then, beginning with the 2001 season, have coached the boys' varsity.

3. I taught in the Essexville-Hampton School District for 29 years before retiring from the classroom in June 2006. I began coaching with Harold Holcomb, a member of the Hall of Fame of MHSTeCA and of the Michigan High School Coaches' Association. As coach of the varsity teams, I have been fortunate enough to be able to maintain Garber's tradition of excellence. I have twice been awarded State Coach of the Year within our Division: in 2000 for coaching the

girls' team and in 2006 for coaching the boys' team. In the 16 seasons I have coached a varsity team at Garber, our teams have qualified for the State Finals Tournament 13 times (and have come close to qualifying the other times). I also serve on the Michigan High School Athletic Association (MHSAA) State Seed Committee for Girls' State Finals, and I am a member of the MHSAA Tennis Rules Committee. I have managed the area's regional tournament for 12 years.

4. I am the 1st Vice President of the Michigan High School Coaches' Association (MHSCA), and will become President this fall. MHSCA is an organization of high school coaches in all sports throughout the state. My role in MHSCA has given me a chance to gain perspective on all high school sports in which Michigan athletes compete.

5. Of greater significance for this case, I am the President of MHSTeCA, having previously served a two-year term as Second Vice President and another two-year term as First Vice President. I have been on the Board of Directors of MHSTeCA for 12 years. MHSTeCA is an organization of approximately 400 high school tennis coaches throughout Michigan, dedicated to the advancement of the sport in the state. Many of its members have been active in Michigan high school tennis for several decades. The membership of MHSTeCA has a deeper knowledge of Michigan high school tennis than any other person or group of people; more than any other group, it reflects an embodiment of the Michigan high school tennis community.

6. I am familiar with the attitudes of coaches, parents, and players in the Michigan high school tennis community towards the prospect of a switch of tennis seasons. MHSTeCA's Board of Directors, which has 58 members distributed among the eight districts of the state, has voted unanimously in favor of keeping girls' tennis in the fall. It has approved the participation of MHSTeCA in this litigation, and the substance of this affidavit, emphatically and without dissent.

2

I believe the views stated here – that fall is a far better season than spring for high school tennis in Michigan and that a change of the girls' season from the fall to the spring would be harmful to girls.– are shared nearly unanimously by Michigan high school tennis coaches and by the overwhelming majority of parents and players.  Having coached extensively both in the fall and in the spring, I can say unequivocally that the fall is the better season, especially for girls.

*Weather*

7.  Perhaps the most obvious reason why the fall is the better season is the weather.  I have reviewed data on weather assembled by counsel.  These data confirm what is common knowledge in the tennis community: The weather is significantly worse in the spring than in the fall.  It is much colder in the spring than in the fall.  There is much more precipitation in the spring than in the fall.  The spring is much windier than is the fall.

8.  Each of these factors affects tennis substantially.  Indeed, I believe that tennis is more vulnerable to bad weather than is any other sport sanctioned by MHSAA, and girls' tennis is more vulnerable to bad weather than is boys' tennis.

9.  *Precipitation* – In all other sports in which Michigan high school students compete outdoors – such as football, soccer, baseball, softball, golf, cross-country, track and field, and lacrosse – competition can be held in rain or snow, often even if the precipitation is heavy.  This is not so in tennis.  Uniquely, tennis is competed outdoors on a hard surface.  Tennis courts become dangerously slippery when wet.  Therefore, even a light drizzle will cause at least suspension of a match.  (Even if the match were not suspended because the court is unsafe, it would soon enough have to be suspended because a wet ball is unplayable.)  If the precipitation persists, the match must be canceled.  Even if the precipitation ends quickly, that does not mean the match can

3

continue; the courts must first be dry, and especially in cool weather this can take hours.

10. *Cold* – Tennis is unusually vulnerable to cold weather because, unlike all or virtually all the other outdoor sports played by Michigan high school athletes, it requires great manual dexterity on the part of all players, it is played nearly continuously, with only short breaks, *and* it cannot be played well with gloves. In some sports – cross-country, for example – manual dexterity does not play a significant role. In others – football, for example – manual dexterity is important only for some positions. And in most outdoor sports in which manual dexterity is required, it is only essential episodically. A quarterback or a pitcher can sit on the sidelines roughly half the game with a hand warmer. A golfer has considerable time between shots. Not so in tennis. There is no dichotomy between "skill" positions and other positions in tennis. All players must handle the racket throughout the match. Every player is involved in every point. With tightly confined exceptions, play is continuous. (There is a brief break, lasting no more than 90 seconds, during change-overs after odd games of a set. Only if the first two sets of a match are split is there a break long enough for players to leave the court area – up to five minutes before a third set.) Furthermore, unlike most other athletes who handle a club or stick, tennis players suffer a significant handicap if they wear gloves, because players must quickly switch grips in the middle of a point. Finally, cold weather makes a tennis ball dense and hard. It bounces less than a warmer ball, and makes a harder impact on the racquet. This puts a greater strain on arm muscles. For those who are able to play indoors during the winter, this factor makes the transition to outdoor playing particularly difficult, and so it distorts results of tryout matches at the beginning of the spring season, when team selections and placements are made. In short, cold weather makes for particularly miserable playing conditions for tennis.

4

11. In my experience, girls who play tennis are much more likely to suffer in cold weather than are boys. I understand that medical data support my long-standing perception that girls are more likely to suffer numbness and pain in their extremities than are boys. I myself suffer from Raynaud's Disease, a disorder that vastly increases vulnerability to these symptoms. Rarely does this condition pose a problem in the fall. During the spring, by contrast, I must often resort to wearing gloves, which makes it very difficult for me to feed balls to my team.

11. The fall season begins in warm summer weather. Even at the end of the season in October, the weather is generally tolerably warm – and as I discuss below, if the weather is poor at the end of the season, when end-of-year tournaments are played, that is of secondary importance. The spring season, by contrast, begins in March, when the weather is still very cold. Even in early and mid April, the temperature is generally cool, and frequently intolerably cold.

12. The combined effect of precipitation and cold is reflected in what is one of the enduring images of the spring season – boys shoveling off tennis courts so that they can get practice time.

13. *Wind* – Wind plays havoc with tennis, more than any with other outdoor sport. A tennis ball is hit in the air – not held or hit on the ground – throughout play. Unlike other balls, it is light and hollow, so that it is particularly affected by wind. On average, girls do not hit the ball as hard as boys, and they hit it higher, which means that their shots are more affected by the wind. Moreover, more than in most sports, tennis players are constantly trying to find a very narrow window – to hit a ball on a line or as close to it as possible without it going out. The wind, therefore, is especially likely to turn a great shot not merely into a pretty good one but into a bad one. I have found that the effect of the wind is especially pronounced near Michigan's bays and

5

lakes. Spring breezes off the cold water are particularly hard on tennis players.

14. *Indoor Courts* – Except for end-of-year tournaments, indoor courts are not a satisfactory alternative from September through May. Over the summer, when a significant portion of the fall season is played, demand for indoor tennis courts is usually very light. Furthermore, players are available to play during the working week, when demand is at its lowest. Accordingly, if the weather is bad, teams can often practice and compete indoors.

15. The situation changes radically, however, after Labor Day. As a practical matter, virtually all high school tennis practices and competitions scheduled between Labor Day in early September and Memorial Day in late May must be held outside. This period covers almost the entire school year, and all but the very end of the spring season; the boys' state tournaments have generally been held a few days after Memorial Day. During this period, and especially at the times when practices and competitions are scheduled – in the afternoons and on the weekends – almost all indoor courts are reserved on a regular basis for other uses. Even if courts are available, they are expensive.

16. Some teams are lucky enough to find a limited number of indoor courts available for practice for a limited time period. But even if so, the use of a small number of courts by a large number of players means that the timing will be extremely inconvenient or that any individual player will get to practice far less – each player will hit fewer balls – than when outdoor play is possible. My boys' team must practice between 8 and 10 pm. My predecessor as president of MHSTeCA, Tom Leyrer, is the coach at Jenison High School. His boys' team must practice from 5 to 7 a.m. At both schools, team members must pay for the court time, and each player must arrange his own transportation to and from the club. Some schools resort to using gymnasiums

6

for indoor practices.  Given the competing demands on gyms, practice time there is limited if it is available at all.  Even if a gym is available, it is a highly unsatisfactory substitute for a court.  Most gyms are not set up with nets and tennis lines; gyms do not offer nearly the space that a set of tennis courts does; and the surfaces of gyms and tennis courts are very different, which causes the ball to bounce very differently.

17.  As for competitions, a given community virtually never has sufficient available indoor courts for a match or tournament to be held.  The usual end result is simple: *If a match or tournament cannot be played outside, it cannot be played.*

18.  The only significant exception is the end-of-year tournaments.  They are played in large part during the ordinary school day, when indoor courts are more readily available.  They are also played in cities with sufficient capacity to move the tournaments inside if necessary.  Because of the importance and one-shot nature of these tournaments, available courts can be found.  Moreover, after the first day of the regional tournament, the season has ended for most players in the state, so the problem is mitigated.  In short, even if the weather is bad at the very end of the fall season, the problem is not serious, because an adequate substitute is at hand.

19.  *Summary* – Weather affects all sports played outside.  Bad weather affects tennis particularly badly.  The weather in the fall season is far superior to that during the spring season.  Moreover, for the first few weeks of the fall season, before Labor Day, and for the end-of-season tournaments, indoor courts provide a suitable alternative; they do not for the balance of the time until Memorial Day.  Weather is a highly significant factor making the fall season better than the spring for playing high school tennis in Michigan, especially for girls.

7

*The School Calendar*

20.  The fall tennis season is far better placed than the spring season in relation to the

school calendar.  The fall season begins before the school year.  Players can try out, practice, and

compete with few other demands on their time. When this case was tried, the fall season began

approximately two weeks before the school year.  Now, however, because Michigan schools do

not begin until after Labor Day, the fall athletic season begins approximately three weeks before

school, which increases this benefit.  (Michigan families understand that if they have a high school

student doing a fall sport and they want to take a vacation out of town, they should do so before

the second part of August.)  The season ends in October, end-of-semester exams are still months

away.

21.  The spring season, by contrast, is played entirely during the school year.  It reaches its

climax near the end of the year, around the time of final exams. Indeed, the two weeks of

Advance Placement exams occur in May, in the heart of the season;  For seniors, the timing is

particularly difficult. Their school year typically ends before Memorial Day. Thus, final exams are

held during the tennis season.  Moreover, academic scheduling is only part of the story.  In the

spring, there are far more dates that are important to well-rounded students who play tennis than

there are in the fall – Science Olympiad, Forensic Finals, Band Festivals, and on and on.  End-of-

year school ceremonies and celebrations are often held during the season.  This includes the Prom,

which tends to take far more preparation time for girls than for boys.  Teams are frequently forced

to choose between attending these significant culminating events and competing in the end-of-

year tournaments.  One would be hard pressed to select a season better designed to add stress to a

teenager's life and conflict with high school's educational mission.

8

*Opportunities for Preparation*

22. The opportunities to prepare for the fall season are far superior to those for the spring. For nearly two months before the fall season begins, students are out of school on summer vacation. The weather is warm, they can play outside, courts are plentiful, and a wealth of instructional programs – camps and clinics – and of tournaments is available. It is relatively easy for a girl to begin the season well prepared.

23. The period before the spring season, like the season itself, occurs entirely during the school year, while students are occupied with their studies, and in dead of winter, precluding outside play. For many students, indoor play is prohibitively expensive. In any event, most students cannot feasibly play indoors for more than a small amount of time per week. Tournaments and instructional programs are considerably sparser than during the summer. Boys now are therefore far more likely than girls to come to tryouts poorly prepared.

*Season Length*

24. In the Lower Peninsula, the spring tennis season is nominally 14 days longer than is the fall season. But those are nominal dates only. The *effective* season is longer in the fall than in the spring. As I have noted, girls are ready to start the season well prepared. The weather is warm, and it remains warm enough throughout the 69-day season. As a result, many teams compete practically from the first permissible date until the end. For most schools, by contrast, boys' competition cannot begin until well after the start of the nominal season in the first half of March. It is much harder for players to begin the season prepared, and the weather precludes outdoor competition – the only feasible type for most schools – for several weeks. As a result, most teams do not dare schedule competitions before several days of April have passed, and there

are fewer than 60 days left in the season. Even then, weather conditions are considerably suboptimal. Not until the last half of April, when there are fewer than 50 days left in the season, does the average temperature reach as high as the lowest level to which it drops in the fall season. Furthermore, most schools have spring break during the season; typically, this is nine or ten calendar days spanning Easter weekend, and it is at best difficult to schedule competitions during this time, because many families travel out of town.

### Minimizing Conflicts

25. Many student-athletes play more than one sport – but they cannot feasibly do so in one season. If a student's two favorite sports are played in the same season, therefore, she must choose between them. The more crowded a given season is with girls' sports, the more girls will face this kind of conflict. Data assembled by counsel confirm what those in the tennis community have long believed to be true: The spring is overcrowded for girls' sports relative to the fall. Switching the girls' basketball and volleyball seasons will not likely have much impact. Moving girls' golf into the fall will mitigate the situation to some extent. But moving girls' tennis into the spring would severely aggravate the situation. Some girls – whose favorite sport other than tennis is played in the fall – would benefit from the switch. But far more girls who now are able to play their two favorite sports, tennis in the fall and another (such as soccer, softball, or track and field) in the spring would have to give up one or the other.

### Impact on Scholarship Prospects

26. I understand that two out-of-state witnesses who professed no experience with or expertise with respect to Michigan high school tennis testified that tennis players have a better chance for scholarships if the high school season is in the spring than if it is in the fall. I believe

10

the argument is utterly ungrounded in the realities of Michigan tennis.  In fact, to the extent there is a difference, setting the high school tennis season in the fall *improves* a player's chance of getting a scholarship.

27.  *First*, impact on scholarship prospects is a fanciful concern for the overwhelming majority of high school tennis players in Michigan.  Very few high school tennis players have any realistic chance of receiving a scholarship, and even less of receiving a scholarship at a university they would want to attend.  For example, in my years as a varsity coach, I have coached a total of approximately 200 players; our teams have had considerable success, as noted above; only a few of my players have been offered tennis scholarships; and every one of these players has turned down the offer to attend an academically more prestigious college.  For most high school players, any impact of the assignment of seasons on the prospect of a college tennis scholarship is of no significance.

28.  *Second*, most girls in the nation, and in the states near Michigan, play high school tennis in the fall.  Even if playing high school tennis in the fall theoretically put a player at a disadvantage for scholarship prospects, it is not clear against whom she would be disadvantaged.

29.  *Third*, even as compared to girls who play high school tennis in the spring, Michigan girls are not in fact disadvantaged.

30.  The summer USTA tournaments are far from the exclusive consideration for college recruiters.  Performance in high school competition also plays a role.  Though there are more USTA tournaments in the summer, a player eager to play in such tournaments can find them all year round.  (See the USTA website at http://tennislink.usta.com/tournaments/Schedule/Search.aspx.) Rankings – a more comprehensive measure than performance in one or two tournaments –

11

depend on cumulative performance in all those tournaments, and not in other competitions. Seedings in any given tournament also depend on rankings; thus, a player hoping to be seeded well in the summer tournaments must have played in a significant number of USTA tournaments beforehand.

31. Given today's level of competition, nobody becomes a serious candidate for a college scholarship, and particularly an elite scholarship, merely by picking up a racket in time to play a high school season, whether spring or fall. A serious scholarship candidate must play year round, and private instruction and coaching are inevitably significant parts of the formula. To get a sense of the active, year-round tournament participation by Michigan's top-ranked players, one may examine the actual player records., which are posted on the USTA website. For example, the records for ranked 18-and-under female players in Southeastern Michigan are available at <http://tennislink.usta.com/tournaments/rankings/rankinglists.aspx?id= 295967>.

32. Playing on a high school team is not even the optimal preparation on the eve of elite tournaments. Indeed, some high-ranked players of high school age in Michigan decline to play on their high school teams because they feel doing so would distract them from more intense preparation and competition. The practice is especially prevalent among boys, whose high school season comes right before the summer tournaments. If the seasons were switched, the practice would probably become more prevalent among top-ranked girls than it is among boys, because at the upper levels, the competition in girls' high school tennis in the state is spread thin; a scholarship candidate is far more likely to find a tough match in a spring USTA tournament than among her teammates or in most interscholastic competitions.

33. *Fourth*, so far as I am aware the trial witnesses offered only speculation, and no

12

proof, that playing in the fall disadvantages Michigan girls seeking scholarships. That is hardly surprising. The experience of Michigan coaches, as represented by MHSTeCA, is that the proposition is simply not true.

34. *Fifth*, two significant factors make the fall a *better* season for players seeking college scholarships. (1) Because college tennis is primarily a spring sport, coaches and other scouts have much more time in the fall to evaluate potential recruits. I see far more college coaches on recruiting trips during the fall season than I do in the spring. (2) The fall season, but not the spring season, is played before commitments by colleges and by students must be made. Accordingly, fall players have an extra year in which to be evaluated.

### Adequacy of Representation

35. The facts stated above demonstrate that, without any genuine doubt, the fall is the better season for girls' high school tennis in Michigan. Virtually anybody with extensive experience in Michigan high school tennis would say the same thing.

36. I understand that in its opinion of December 17, 2001, the Court said that "the MHSAA presented no evidence that both sexes playing tennis in the same season would create logistical problems." Virtually any tennis coach could have testified that in fact the limited number of courts would mean that if the seasons were combined there would be far fewer total opportunities for tennis players, and that girls would almost certainly suffer the most. (Like some other coaches, I do not cut; every player can be a member at least of the junior varsity. This would not be possible if seasons were combined, and a higher proportion of girls than of boys would be cut.) Similarly, virtually any tennis coach could have testified that combining seasons would not have offered substantial benefits in sharing travel, promotion, coaching, or facility

13

rental time. However attractive mixed doubles may sound in theory, virtually any coach could have testified that colleges maintain separate men's and women's teams and therefore do not compete in mixed doubles, and that to hold competition in mixed doubles would diminish the opportunities for Michigan players to compete in singles and ordinary doubles.

36. MHSTeCA does not have the funds to hire counsel to present the points made in this affidavit. Not until the father of a tennis-playing girl offered his services as counsel *pro bono* have we been able to present the reasons why the fall is the better season.

**Conclusion**

37. The situation is clear beyond any genuine doubt: Girls who play high school tennis in Michigan have the optimal situation now, playing in the fall and not having to share limited facilities and team positions with boys. Any change from that situation would be seriously detrimental to the interests of tennis-playing girls.

Respectfully submitted,

*Nancy Brissette*

Nancy Brissette

Sworn to before me this 9th day
of April 2007

*Marjorie E. Suprunowicz*

MARJORIE E. SUPRUNOWICZ, Notary Public
Bay County, Michigan
My Commission Expires:  12-07-07

14

UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF MICHIGAN

COMMUNITIES FOR EQUITY, ET AL.,

PLAINTIFFS, :

v.                                                          No. 1:98CV479

:

MICHIGAN HIGH SCHOOL ATHLETIC ASSOCIATION, INC.,

DEFENDANT.

:

**AFFIDAVIT OF KAREN CAINE**

KAREN CAINE, being duly sworn, deposes and says:

1. I am the coach of the girls' varsity tennis coach at Adrian High School. I submit
this affidavit in support of the motions of the Michigan High School Tennis Coaches'
Association and certain parents to intervene and to modify the remedial order of this
court, and for associated relief. I believe it is absolutely clear that the fall is the
preferable season for girls' high school tennis in Michigan; I do not know of anybody in
the Michigan tennis community who believes otherwise.

2. I coached the women's tennis team at Hanover College from 1978 to 1988, and
then the women's tennis team at Adrian College from 1990 to 2004, when I retired from
that position. I have coached at Adrian High School since 1994. I was named the Hoosier
Conference of Women's Tennis Coach of the Year in 1986 and a Michigan Regional
Coach of the Year in 2003. During my twelve years of high school coaching, our team
has qualified for the Michigan state tournament eight times.

3. I am familiar with the main points made by the intervenors, and I fully agree with
them. The fall season – the one in which the girls play now – is far the better one. The

1

weather is much better than in the spring.  Pre-season opportunities are far better for the
fall than for the spring.  The fall season comes at a better time in the school calendar than
does the spring season.  The fall creates fewer conflicts for girls wanting to play other
sports than does the spring.  I submit this affidavit to amplify on and supplement these
points.

4.  It is simply not true that the spring is the traditional sport for tennis and that the
fall is not.  In many places, the season for girls' or women's competitive tennis is the
fall.  Indeed, some college conferences have their women's season in the fall.  I
understand that in all the states touching or near Michigan, except for Indiana, girls' high
school tennis is played in the fall.  Because Adrian is close to the Ohio border, and is
effectively part of the Toledo metropolitan area, my girls' team is able to play regular
matches and scrimmages with nearby Ohio teams, Sylvania Northview and Sylvania
Southview.  These are excellent competitive opportunities for my players, which would
be lost if the Michigan girls' season is changed to the spring.

5.  At Adrian High School, many of the girls who play tennis compete in softball, soccer or
track in the spring.  If their tennis season is moved to the spring, they will have a conflict
between sports – and there are not nearly as many competitive opportunities for them in the fall.

6.  In Adrian, as in many smaller communities, there are no indoor tennis courts.  This
factor significantly increases the relative advantage of the fall season over the spring for tennis,
for two reasons.

7.  First, it has a significant effect on opportunities to prepare for the season.  As matters
now stand, all girls, novices included, have an opportunity to prepare for the fall season by
playing on outdoor courts during the summer.  By contrast, very few of our boy players have any

opportunity to prepare for the spring season. Playing outdoors in the winter is not feasible, of course, and few parents arrange before the season for their sons to travel to other towns or cities for indoor playing and practice time. If the girls are required to play in the spring, it the situation would be reversed. I can imagine almost nothing more likely to discourage a girl without much playing experience than having to try out for the team on an outdoor court in March without having prepared for the season. The participation of girls is sure to drop off.

7. Second, because we have no indoor courts, when the weather precludes outdoor practices or matches during the season (as it does far more often during the spring than during the fall), Adrian tennis players have no indoor alternative that involves hitting tennis balls. A team sometimes does indoor conditioning exercises in the hallway – the gymnasiums are usually occupied – but there is no opportunity for tennis.

8. A change of the girls' tennis season from the fall to the spring would be seriously detrimental to the interests of the girls who play tennis in Michigan.

Respectfully submitted,

*Karen Caine*

Sworn to before me this
7 day of April 2007.

*Melanie D Brooks*
Melanie D. Brooks

MELANIE D. BROOKS
Notary Public, Lenawee Co., MI
Acting In Lenawee Co., MI
My Comm. Expires June 23, 201

3

UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF MICHIGAN

_____

COMMUNITIES FOR EQUITY, ET AL.,

                                    PLAINTIFFS,              :

          v.                                                        No. 1:98CV479

                                                                    :

MICHIGAN HIGH SCHOOL ATHLETIC ASSOCIATION, INC.,

                                    DEFENDANT.

_____:

## AFFIDAVIT OF AMY CHRISTMAN

AMY CHRISTMAN, being duly sworn, deposes and says:

1. I am the mother of, and appear in this action as next friend to, L.C., a 15-year old girl

who is a freshman at Allegan High School, in Allegan, Michigan. I submit this affidavit in support

of the motion of the Michigan High School Tennis Coaches' Association and several parents,

including myself, for intervention and other relief.

2. L.C. is a member of the Allegan varsity tennis team and also of the varsity soccer team.

Even though she is just a freshman, she played second singles on the tennis team, and she is a

starter on the soccer team. If the girls' tennis season is switched to the spring, she will be

substantially harmed. First, she will be forced to choose one sport or the other. These are the

two sports that she loves the most and at which she most excels. Other opportunities for fall

sports are limited in Allegan, and in any event there is no other sport played in the fall that comes

close to tennis, in terms of her ability or her desire to play it. Second, if she chooses tennis, she

will be compelled to play in an inferior season, largely because the weather is so much poorer than

in the fall. (Weather is much less of a factor with respect to soccer.)

3. L.C. is an outstanding student, and I expect that academics will be the primary factor

governing her choice of a college. Although L.C. is obviously a talented athlete and her abilities could potentially earn her an athletic scholarship, it is unlikely it would be at a college that she is interested in attending academically. L.C. plays because of her love for the sports. She is well aware of the various benefits that playing varsity sports offers her – among which is that it makes her a more attractive candidate for admission to the college of her choice – but the prospect of a college scholarship plays no role in her devotion to her sports. Nor does it play any role in the considerable support that my husband (her father) and I have given her athletic activities since she was very young.

4. I understand that the trial in this case was held in 2001, when L.C. was in the fourth grade. I do not believe I knew of this litigation until considerably later. In any event, it was not until well after the trial that I recognized that L.C. was likely going to be a varsity athlete and that she would be affected by this litigation. At no time would it have been financially practical for my husband and me to hire an attorney to protect the interests of our daughter in this litigation, but when we heard that *pro bono* counsel was representing the interests of girls' tennis, we immediately expressed interest in joining the effort.

Respectfully submitted,

Amy Christman

Sworn to before me this 9th day
of April 2007

SHARON K. SYSWERDA
Notary Public, State of Michigan, County of Van Buren
My Commission Expires July 13, 2011
Acting in the County of Van Buren

2

## UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| Communities for Equity, et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | No. 1:98CV479 |
| | ) | Hon. Richard A. Enslen |
| Michigan High School Athletic | ) | |
| Association, Inc., | ) | |
| | ) | |
| *Defendant* | ) | |
| | ) | |
| The Michigan High School Tennis | ) | |
| Coaches' Association, Amy Christman, as | ) | |
| Next Friend of L.C., Richard D. | ) | |
| Friedman, as Next Friend to R.A.F., | ) | |
| and Rafat Rizk, as Next Friend to M.R. | ) | |
| | ) | |
| *Applicants for Intervention* | ) | |

**INTERVENOR'S COUNSEL:**

**Richard D. Friedman (P42575)**
**Lead Counsel**
625 South State Street
Ann Arbor, Michigan 48109
Telephone: (734) 647-1078
Facsimile: (734) 647-4188
E-mail: rdfrdman@umich.edu

**Stuart H. Deming (P27627)**
**Local Counsel**
Deming PLLC
229 E. Michigan Ave, Ste 445
Kalamazoo MI 49007
Telephone: (269) 382-8080
Facsimile: (269) 382-8083
E-Mail: stuart.deming@deminggroup.com

**Garry L. Walton (P31199)**
**Local Counsel**
Garry L. Walton PC
229 E Michigan Ave, Ste 445
Kalamazoo MI 49007
Telephone (269) 383-3434
Facsimile (269) 383-2997
E-mail: glwalton@charterinternet.com

## AFFIDAVIT OF RICHARD FRIEDMAN
## IN SUPPORT OF MOTION TO INTERVENE

RICHARD D. FRIEDMAN, being duly sworn, deposes and says:

1. I am a professor at the University of Michigan Law School and a member of the bar of the State of Michigan; my application for membership in the bar of this Court is pending. I am the father of, and appear in this action as next friend to, R.A.F., a 14-year old girl who is a freshman at Ann Arbor Huron High School, in Ann Arbor, Michigan. I am acting as counsel *pro bono* on behalf of the Michigan High School Tennis Coaches' Association (MHSTeCA) and other persons, including myself, moving for intervention and modification of the Court's remedial order. (Garry L. Walton, Esq., and Stuart H. Deming, Esq., are acting as local counsel, also *pro bono*.) I believe that if the tennis seasons switch it will seriously impair the interests not only of my daughter but of thousands of other girls in the Lower Peninsula of Michigan every year.

2. My daughter, R.A.F., was a member of the varsity tennis team at Huron this past season. She played second doubles on the team, which won the state Division I championship. (Technically, this was the Lower Peninsula championship, but it is almost universally referred to as championship of the state.) She is also a member of the varsity softball team, for which she is the starting first baseman. If the girls' tennis season is moved to the spring, she will be harmed in two ways. First, if, in accordance with her current preference, she continues to play tennis, she will be harmed because the spring season is, for all the reasons stated in support of this motion, inferior to the fall for girls' high school tennis in Michigan. Second, she will have to give up either tennis or softball. These are by far her two favorite sports and the two at which she is most proficient. She might try out for another sport in the fall, but this will not be a substitute for the sport she has to abandon; there is no other sport that she enjoys nearly so much or at which she is

2

nearly so good, none that gives her a good chance of making the varsity next year, and none as to which one could confidently say she would make the varsity even by her senior year.

3.  The brief submitted in support of this motion contains figures on participation of girls in individual sports.  These figures are taken from the National Federation of State High School Associations, *2005-06 High School Athletics Participation Survey*, which is available at <http://www.nfhs.org/core/contentmanager/uploads/2005_06NFHSparticipationsurvey.pdf >.  These figures demonstrate that the situation of R.A.F. and of L.C., daughter of another movant, reflects a problem that will be common for tennis-playing girls if the tennis seasons switch.  The spring is overloaded with girls' sports compared to the fall.  Adding tennis to the spring will aggravate the situation and mean that many more girls will have to abandon one of their favorite sports.

4.  R.A.F.'s success on her tennis and softball teams demonstrates that she is excellent at both sports.  Nevertheless, I do not believe that she is a candidate for a college scholarship.  There are a few dozen girls her age in southeastern Michigan who are better than she is at tennis – some much better – and probably at least that many in softball.  Even if she were offered a scholarship, it would be highly unlikely that it would be at a college that she would want to attend.  She is an outstanding student (straight As through her first semester), her parents (perhaps with insufficient subtlety) set high academic expectations for her, and she sets high expectations for herself.  Academics will be the highest priority in her choice of a college; other factors that enter in will include location and size.  At this point, she has no firm idea whether she will want to play a sport at the varsity level in college.  She is acutely aware of he many benefits she gains from being on varsity sports in high school – including physical, mental, and

3

social (being on the tennis team in the fall provided a wonderful social entree for a young freshman in a large school) – and she knows that among these is the fact that being well-rounded makes her more appealing to college admissions officers, thus improving her chances of getting into a good college.  But the prospect of a college scholarship provides no part at all in her devotion to her sports.  Nor has it provided any basis for the considerable support – in terms of time, money, emotional energy, and chauffeuring – that my wife and I have given her athletic activities.

5.  In September 2001, when this case was tried, R.A.F. was eight years old and in fourth grade.  I do not believe that at that time I knew about this litigation.  In any event, it was not until years later, long after the Court had issued its remedial order and the case was on appeal, that it appeared probable that she would have the desire to play either sport, or some other sport, in high school or the ability to play at a varsity level.  By way of comparison, in elementary school, she showed promise and interest in playing piano – just long enough for us to buy one – and then decided after fifth grade to play the flute instead; she had talent in the flute and played it well in middle school, and then decided not to continue.  She was good enough in Academic Games that she was on a team of five students that won a significant state championship in fifth grade, and on another team of five that won another state championship in the sixth grade – and in seventh grade she gave up playing Academic Games.  These decisions are, of course, an ordinary part of growing up, as a youngster comes to terms with the fact that she cannot do everything and must make choices – but until R.A.F. was in seventh grade or even after, I did not have any confidence that she would go out for her tennis and softball teams, and therefore I did not have the personal interest in this litigation that would justify an attempt to intervene or the very extensive efforts

4

necessary to act as *pro bono* counsel for would-be intervenors. I believe that even if I did have the motivation to try to intervene, I would not have had the standing to do so because my interest would have been speculative. And in any event, I believe that so long as this case was on appeal, any attempt to intervene in this Court to make a demonstration of the facts that applicants now show would have been futile, and irresponsible as a waste of the time of the Court, the parties, and of myself.

6. On August 17, 2006, R.A.F. was told she made the varsity tennis team. I promptly made inquiries about this litigation, and found to my surprise that the emphatic and virtually universal belief in the tennis community is that the fall is the better season for tennis and that a switch to the spring will hurt girls' tennis as a sport and the girls who play it. Only after further inquiries and examination of the trial transcript did I discover, to my considerable surprise, that the interests of girls' tennis had not been protected in this litigation, in that none of the evidence demonstrating that the fall is the better season for girls' tennis had been presented to this Court. After consultation with Tom Leyrer, the then-president of MHSTeCA, and its Board, we agreed that I would represent MHSTeCA in an attempt to keep the girls' tennis season in the fall. I promptly moved for leave to file a brief *amicus curiae* in support of the petition for rehearing in the United States Court of Appeals for the Sixth Circuit (the brief accompanied the motion); that court denied the petition without deciding on my motion. I also filed a brief *amicus curiae* in support of the petition for *certiorari* on behalf of MHSTeCA and the same parents who join in the current motion. These briefs did not take any position on the question of whether MHSTeCA had committed discrimination; rather, their focus was on showing that switching tennis seasons would be harmful to the interests of girls' tennis and the girls who play it.

5

7. By a letter of December 11, 2006, copies of which I sent to counsel for all parties, I gave written notice that if the petition for *certiorari* were not granted I would move to intervene in this Court to seek a modification of the Court's order to keep the girls' tennis season in the fall. I gave notice of this intention in other ways as well, such as by e-mail exchanges with counsel and in person with counsel for and the executive director of MHSAA on January 23, 2007. I repeated my intention on the morning of April 2, 2007, shortly after the Supreme Court announced its decision denying *certiorari*. I have made the motion to intervene at the first opportunity, and no party could be surprised by this motion. MHSAA has nevertheless chosen to announce that the tennis seasons would change next year.

8. My understanding is that counsel for plaintiffs and MHSAA agreed that plaintiffs could if they wished extend the time for filing their brief in opposition to the petition for *certiorari* for one month. In the end, plaintiffs did not exercise that option. If they had done so, as MHSAA anticipated they would, the decision of the Supreme Court denying *certiorari* would have been issued approximately a month later than it was. This motion, therefore, is being made well before the date that MHSAA anticipated the Supreme Court might deny *certiorari.*

9. Before the Supreme Court's decision, I tried to secure the agreement of plaintiffs' counsel to seek to excise tennis from the order of this Court, on the ground that the fall is the better season for tennis. Counsel for plaintiffs replied that the time to engage in such discussions would be at such time as the case returned to the District Court.

10. In accordance with W.D.Mich. LCivR 7.1(d), I have attempted to obtain the concurrence of the parties to this motion, by extensive communications with them, but have not succeeded. All parties are familiar with the arguments that the fall is the preferable season for

6

girls' high school tennis in Michigan. Defendant MHSAA acknowledges the point, though it remains uncomfortable speaking of one season as more advantageous than the other. I have asked plaintiffs' counsel numerous times to tell me if they disagree with me that the fall is the preferable season for girls' tennis, and they have not done so; I doubt they will contest the point, but I cannot be certain. In any event, both plaintiffs and MHSAA have been willing to engage in discussions as to how the tennis seasons might be kept where they have been, but their terms are mutually inconsistent. MHSAA would be willing to consent to keeping the tennis seasons unchanged if other modifications were made to the order so that certain other sports seasons *would not* have to change. The plaintiffs appear willing to consent to keeping the tennis seasons unchanged if other modifications were made to the order so that certain additional sports seasons *would* have to change. In short, all parties are willing to act in the interests of girls' tennis – so long as they can achieve other interests of their own. I have asked counsel for the plaintiffs and for the defense whether, apart from the substance of the relief that we request, they consent to our intervening to present the interests of girls' tennis, but I have gotten no response from plaintiffs' counsel and an ambiguous response from MHSAA's counsel that in any event is not an unqualified yes.

Respectfully submitted,

Richard D. Friedman

Sworn to in _WASHTENAW_ County, Michigan, before me on April _12ᵗʰ_ , 2007 by Richard D. Friedman.

Notary Public

7

State of Michigan, County of _WASHTENAW_
My commission expires: _5/1/2012_

UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF MICHIGAN

_____

COMMUNITIES FOR EQUITY, ET AL.,

                    *PLAINTIFFS,*        :

         v.                                   No. 1:98CV479

                                            :

MICHIGAN HIGH SCHOOL ATHLETIC ASSOCIATION, INC.,

                    *DEFENDANT.*

_____:

### AFFIDAVIT OF POONAM KUMAR

POONAM KUMAR, being duly sworn, deposes and says:

1. I am a third-year student at the University of Michigan Law School. I have assisted Professor Richard Friedman in connection with this and other matters.

**Allocation of Seasons**

2. Below is a list of states in addition to Michigan in which girls high school tennis is played in the fall; each is listed with a website indicating the seasonal allocation.

    **Alaska**, http://www.asaa.org/calendar/pdf/200607Calendar.pdf

    **Arkansas**, http://www.ahsaa.org/Tennis%20Handbook.pdf

    **California**, http://www.cifstate.org/ (displaying Northern California girls' fall tennis schedule); www.cifss.org/index.php?menuID=Homepage#fall (displaying Southern California girls' fall tennis schedule);

    **Illinois**, http://www.ihsa.org/activity/tng/index.htm

    **Kansas**, http://www.kshsaa.org/GRL-TENNIS/2006-07%20Tennis%20Dates.html

    **Minnesota**, http://www.mshsl.org/mshsl/activitypage.asp?actnum=420

    **Missouri**, http://www.mshsaa.org/Activities/Info/Tennis.aspx

**Nevada**, http://www.njsiaa.org/

**New Jersey**, http://www.njsiaa.org/tournaments/2007/0607tourndates.pdf

**New York**, http://www.nysphsaa.org/

**North Carolina**, http://www.nchsaa.org/pdf/4065.pdf

**Ohio**, http://www.ohsaa.org/sports/te/girls/default.asp

**Pennsylvania**, http://www.piaa.org/sports/tennis/

**Rhode Island**, http://www.rihssports.com/

**South Carolina**, http://www.schsl.org/2006/06-07%20Sports%20Calendar.htm

**South Dakota**, http://www.sdhsaa.com/Publications/Handbook/Athletics/29%20-
%20TENNIS.pdf

**Texas**,

http://www.uil.utexas.edu/athletics/manuals/team_tennis/pg4_6calrule_plan.pdf

**Utah**,http://www.uhsaa.org/info/index.php?option=com_content&task=view&id=164
&Itemid=113

**Wisconsin**, http://www.wiaawi.org/calendar/state.htm

**Wyoming**, http://www.whsaa.org/stateevents/tennis/statetennis.asp

(Further information on the states allocation of tennis seasons is available at www.mhsteca.org,
under the tab List of States.)

    3.  According to census data, taken from the United States Census Bureau's *Annual
Estimates of the Population for the United States, Regions and States, and for Puerto Rico: April
1, 2000 to July 1, 2006 (NST-EST2006-01)*, which is available at
<http://www.census.gov/popest/states/NST-ann -est.html>, these states include seven of the
nation's eight largest, excluding only Florida.  With the exception of Indiana, they include all

states touching the Great Lakes and all states bordering Michigan or within 200 miles of it. In the aggregate, these states comprise approximately 60% of the nation's population.

4. Below is a cartogram of the continental United States, in which the size of the representation of each state is proportional to its population. States in which girls' high school tennis is played in the fall are shaded; states in which girls' high school tennis is played in the spring are not shaded. This demonstrates visually that the fall is the dominant season for girls' tennis, especially in the Upper Midwest.



3

**Participation**

5. The National Federation of State High School Associations' *2005-2006 High School Athletics Participation Survey*, which is available at

http://www.nfhs.org/core/contentmanager/uploads/2005_06NFHSparticipationsurvey.pdf,

provides participation data by sport and by state.  This allows computation of participation rates. In states that schedule girls' high school tennis in the fall, 611 girls per million total population play, while in spring states 580 girls per million total population play. This differential holds despite the fact that the fall states are weighted towards the colder parts of the country.  Where boys play tennis in the fall, the participation rate is 629 per million, and where they play in the spring the rate is only 520 per million.  (The Survey does not give participation data for tennis in Georgia; accordingly, the per capita participation numbers presented here have been calculated without reference to that state.)

**Weather**

*Precipitation*

6. Below is a table showing precipitation for the months of the fall and spring tennis seasons for each of three cities in Michigan: Detroit, Grand Rapids, and Lansing (the two largest cities and the state capital).  The sources for the table are Midwestern Regional Climate Center, Precipitation Threshold Climatology for Detroit Metropolitan Airport, MI from 1971-2000, *available at* http://mrcc.sws.uiuc.edu/climate_midwest/historical/precip/mi/202103_psum.html; Midwestern Regional Climate Center, Precipitation Threshold Climatology for Grand Rapids International Airport, MI from 1971-2000, *available at*

http://mrcc.sws.uiuc.edu/climate_midwest/historical/precip/mi/203333_psum.html; and

4

Midwestern Regional Climate Center, Precipitation Threshold Climatology for Lansing Capital

City Airport, MI from 1971-2000, *available at*

http://mrcc.sws.uiuc.edu/climate_midwest/historical/precip/mi/204641_psum.html.  June is not

included in this and the other tables showing monthly data, because the spring season ends at the

very beginning of the month in the Lower Peninsula.

**Average number of days with at least .01" precipitation**

|  | **Detroit** | **Grand Rapids** | **Lansing** |
|---|---|---|---|
| **Spring Season** |  |  |  |
| March | 12.7 | 12.2 | 12.8 |
| April | 12.5 | 13.2 | 12.7 |
| May | 11.6 | 10.7 | 10.9 |
| **Fall Season** |  |  |  |
| August | 9.5 | 9.7 | 10 |
| September | 9.9 | 10.5 | 10.8 |
| October | 9.8 | 11.3 | 10.1 |

This table indicates that, on average, precipitation will interfere with the play of tennis in the

Lower Peninsula about two days per month more in the spring season than in the fall.

*Temperature*

7.  The tables below indicate, for the same three cities, the average daily maximum

temperature for every day during the 2006-07 tennis seasons.  The sources for these tables are

U.S. Department of Commerce National Climatic Data Center, Local Climatography for Grand

Rapids International Airport, MI from 1971-2000, *available at*

http://www.ncdc.noaa.gov/DLYNRMS/dnrm?coopid=202103; U.S. Department of Commerce

5

National Climatic Data Center, Local Climatography for Lansing Capital City Airport, MI from

1971-2000, *available at* http://www.ncdc.noaa.gov/DLYNRMS/dnrm?coopid=204641; and U.S.

Department of Commerce National Climatic Data Center, Local Climatography for Detroit

Metropolitan Airport, MI from 1971-2000, *available at*

http://www.ncdc.noaa.gov/DLYNRMS/dnrm?coopid=202103.

### Average Daily Maximum Temperature, 1971-2000

|  | Detroit | Grand Rapids | Lansing |
|---|---|---|---|
| **Spring Season** |  |  |  |
| March 12 | 44 °F | 42 °F | 42 °F |
| March 13 | 44 °F | 42 °F | 42 °F |
| March 14 | 44 °F | 42 °F | 43 °F |
| March 15 | 45 °F | 43 °F | 43 °F |
| March 16 | 45 °F | 43 °F | 43 °F |
| March 17 | 46 °F | 44 °F | 44 °F |
| March 18 | 46 °F | 44 °F | 44 °F |
| March 19 | 46 °F | 45 °F | 45 °F |
| March 20 | 47 °F | 45 °F | 45 °F |
| March 21 | 47 °F | 45 °F | 46 °F |
| March 22 | 48 °F | 46 °F | 46 °F |
| March 23 | 48 °F | 46 °F | 46 °F |
| March 24 | 48 °F | 47 °F | 47 °F |
| March 25 | 49 °F | 47 °F | 47 °F |
| March 26 | 49 °F | 48 °F | 48 °F |
| March 27 | 50 °F | 48 °F | 48 °F |
| March 28 | 50 °F | 48 °F | 49 °F |
| March 29 | 51 °F | 49 °F | 49 °F |
| March 30 | 51 °F | 49 °F | 49 °F |
| March 31 | 51 °F | 50 °F | 50 °F |
| April 1 | 52 °F | 50 °F | 50 °F |
| April 2 | 52 °F | 51 °F | 51 °F |
| April 3 | 53 °F | 51 °F | 51 °F |
| April 4 | 53 °F | 51 °F | 52 °F |
| April 5 | 53 °F | 52 °F | 52 °F |
| April 6 | 54 °F | 52 °F | 52 °F |
| April 7 | 54 °F | 53 °F | 53 °F |

| | | | |
|---|---|---|---|
| April 8 | 55 ºF | 53 ºF | 53 ºF |
| April 9 | 55 ºF | 54 ºF | 54 ºF |
| April 10 | 55 ºF | 54 ºF | 54 ºF |
| April 11 | 56 ºF | 55 ºF | 55 ºF |
| April 12 | 56 ºF | 55 ºF | 55 ºF |
| April 13 | 57 ºF | 55 ºF | 55 ºF |
| April 14 | 57 ºF | 56 ºF | 56 ºF |
| April 15 | 58 ºF | 56 ºF | 56 ºF |
| April 16 | 58 ºF | 57 ºF | 57 ºF |
| April 17 | 58 ºF | 57 ºF | 57 ºF |
| April 18 | 59 ºF | 58 ºF | 58 ºF |
| April 19 | 59 ºF | 58 ºF | 58 ºF |
| April 20 | 60 ºF | 59 ºF | 59 ºF |
| April 21 | 60 ºF | 59 ºF | 59 ºF |
| April 22 | 60 ºF | 60 ºF | 59 ºF |
| April 23 | 61 ºF | 60 ºF | 60 ºF |
| April 24 | 61 ºF | 60 ºF | 60 ºF |
| April 25 | 62 ºF | 61 ºF | 61 ºF |
| April 26 | 62 ºF | 61 ºF | 61 ºF |
| April 27 | 63 ºF | 62 ºF | 62 ºF |
| April 28 | 63 ºF | 62 ºF | 62 ºF |
| April 29 | 64 ºF | 63 ºF | 63 ºF |
| April 30 | 64 ºF | 63 ºF | 63 ºF |
| May 1 | 64 ºF | 64 ºF | 63 ºF |
| May 2 | 65 ºF | 64 ºF | 64 ºF |
| May 3 | 65 ºF | 65 ºF | 64 ºF |
| May 4 | 66 ºF | 65 ºF | 65 ºF |
| May 5 | 66 ºF | 65 ºF | 65 ºF |
| May 6 | 67 ºF | 66 ºF | 66 ºF |
| May 7 | 67 ºF | 66 ºF | 66 ºF |
| May 8 | 67 ºF | 67 ºF | 67 ºF |
| May 9 | 68 ºF | 67 ºF | 67 ºF |
| May 10 | 68 ºF | 67 ºF | 67 ºF |
| May 11 | 69 ºF | 68 ºF | 68 ºF |
| May 12 | 69 ºF | 68 ºF | 68 ºF |
| May 13 | 69 ºF | 69 ºF | 69 ºF |
| May 14 | 70 ºF | 69 ºF | 69 ºF |
| May 15 | 70 ºF | 69 ºF | 69 ºF |
| May 16 | 70 ºF | 70 ºF | 70 ºF |
| May 17 | 71 ºF | 70 ºF | 70 ºF |
| May 18 | 71 ºF | 71 ºF | 70 ºF |
| May 19 | 71 ºF | 71 ºF | 71 ºF |
| May 20 | 72 ºF | 71 ºF | 71 ºF |

7

| | | | |
|---|---|---|---|
| May 21 | 72 °F | 72 °F | 71 °F |
| May 22 | 73 °F | 72 °F | 72 °F |
| May 23 | 73 °F | 72 °F | 72 °F |
| May 24 | 73 °F | 73 °F | 72 °F |
| May 25 | 73 °F | 73 °F | 73 °F |
| May 26 | 74 °F | 73 °F | 73 °F |
| May 27 | 74 °F | 74 °F | 73 °F |
| May 28 | 74 °F | 74 °F | 74 °F |
| May 29 | 75 °F | 74 °F | 74 °F |
| May 30 | 75 °F | 74 °F | 74 °F |
| May 31 | 75 °F | 75 °F | 74 °F |

| | Detroit | Grand Rapids | Lansing |
|---|---|---|---|
| **Fall Season** | | | |
| August 14 | 82 °F | 80 °F | 80 °F |
| August 15 | 82 °F | 80 °F | 80 °F |
| August 16 | 82 °F | 80 °F | 80 °F |
| August 17 | 81 °F | 80 °F | 80 °F |
| August 18 | 81 °F | 80 °F | 80 °F |
| August 19 | 81 °F | 79 °F | 79 °F |
| August 20 | 81 °F | 79 °F | 79 °F |
| August 21 | 81 °F | 79 °F | 79 °F |
| August 22 | 81 °F | 79 °F | 79 °F |
| August 23 | 80 °F | 78 °F | 79 °F |
| August 24 | 80 °F | 78 °F | 78 °F |
| August 25 | 80 °F | 78 °F | 78 °F |
| August 26 | 80 °F | 78 °F | 78 °F |
| August 27 | 79 °F | 78 °F | 78 °F |
| August 28 | 79 °F | 77 °F | 77 °F |
| August 29 | 79 °F | 77 °F | 77 °F |
| August 30 | 79 °F | 77 °F | 77 °F |
| August 31 | 79 °F | 77 °F | 77 °F |
| September 1 | 78 °F | 76 °F | 76 °F |
| September 2 | 78 °F | 76 °F | 76 °F |
| September 3 | 78 °F | 76 °F | 76 °F |
| September 4 | 78 °F | 75 °F | 76 °F |
| September 5 | 77 °F | 75 °F | 75 °F |
| September 6 | 77 °F | 75 °F | 75 °F |
| September 7 | 77 °F | 75 °F | 75 °F |
| September 8 | 76 °F | 74 °F | 75 °F |
| September 9 | 76 °F | 74 °F | 74 °F |

8

| | | | |
|---|---|---|---|
| September 10 | 76 ºF | 74 ºF | 74 ºF |
| September 11 | 75 ºF | 73 ºF | 74 ºF |
| September 12 | 75 ºF | 73 ºF | 73 ºF |
| September 13 | 75 ºF | 73 ºF | 73 ºF |
| September 14 | 74 ºF | 72 ºF | 73 ºF |
| September 15 | 74 ºF | 72 ºF | 72 ºF |
| September 16 | 74 ºF | 72 ºF | 72 ºF |
| September 17 | 73 ºF | 71 ºF | 72 ºF |
| September 18 | 73 ºF | 71 ºF | 71 ºF |
| September 19 | 73 ºF | 71 ºF | 71 ºF |
| September 20 | 72 ºF | 70 ºF | 71 ºF |
| September 21 | 72 ºF | 70 ºF | 70 ºF |
| September 22 | 72 ºF | 70 ºF | 70 ºF |
| September 23 | 71 ºF | 69 ºF | 70 ºF |
| September 24 | 71 ºF | 69 ºF | 69 ºF |
| September 25 | 70 ºF | 68 ºF | 69 ºF |
| September 26 | 70 ºF | 68 ºF | 68 ºF |
| September 27 | 70 ºF | 68 ºF | 68 ºF |
| September 28 | 69 ºF | 67 ºF | 68 ºF |
| September 29 | 69 ºF | 67 ºF | 67 ºF |
| September 30 | 68 ºF | 67 ºF | 67 ºF |
| October 1 | 68 ºF | 66 ºF | 66 ºF |
| October 2 | 67 ºF | 66 ºF | 66 ºF |
| October 3 | 67 ºF | 65 ºF | 65 ºF |
| October 4 | 66 ºF | 65 ºF | 65 ºF |
| October 5 | 66 ºF | 64 ºF | 65 ºF |
| October 6 | 66 ºF | 64 ºF | 64 ºF |
| October 7 | 65 ºF | 64 ºF | 64 ºF |
| October 8 | 65 ºF | 63 ºF | 63 ºF |
| October 9 | 64 ºF | 63 ºF | 63 ºF |
| October 10 | 64 ºF | 62 ºF | 63 ºF |
| October 11 | 63 ºF | 62 ºF | 62 ºF |
| October 12 | 63 ºF | 61 ºF | 62 ºF |
| October 13 | 63 ºF | 61 ºF | 61 ºF |
| October 14 | 62 ºF | 61 ºF | 61 ºF |
| October 15 | 62 ºF | 60 ºF | 60 ºF |
| October 16 | 61 ºF | 60 ºF | 60 ºF |
| October 17 | 61 ºF | 59 ºF | 59 ºF |
| October 18 | 60 ºF | 59 ºF | 59 ºF |
| October 19 | 60 ºF | 58 ºF | 59 ºF |
| October 20 | 59 ºF | 58 ºF | 58 ºF |
| October 21 | 59 ºF | 57 ºF | 58 ºF |

9

*Snow*

8. The table below shows, for each month in the spring and fall tennis seasons, the average number of days with at least 1" snow. The sources for this table are  Midwestern Regional Climate Center, Snowfall Threshold Climatology for Detroit Metropolitan Airport, MI from 1971-2000, *available at* http://mrcc.sws.uiuc.edu/climate_midwest/historical/snow/mi/202103_ssum.ht ml; Midwestern Regional Climate Center, Snowfall Threshold Climatology for Grand Rapids, MI from 1971-2000, *available at* http://mrcc.sws.uiuc.edu/climate_midwest/historical/snow/mi/203333_ssum.ht m; Midwestern Regional Climate Center, Snowfall Threshold Climatology for Lansing Capital City Airport, MI from 1971-2000, *available at* http://mrcc.sws.uiuc.edu/climate_midwest/historical/snow/ mi/204641_ssum.html.

**Average number of days with at least .1" snow**

|  | **Detroit** | **Grand Rapids** | **Lansing** |
|---|---|---|---|
| **Spring Season** |  |  |  |
| March | 5.5 | 7 | 7.1 |
| April | 2 | 2.4 | 2.1 |
| May | 0 | 0.1 | 0 |
| **Fall Season** |  |  |  |
| August | 0 | 0 | 0 |
| September | 0 | 0 | 0 |
| October | 0.3 | 0.6 | 0.4 |

10

*Wind*

9. The table below shows the average wind speed for the same three cities for each month in the two tennis seasons. The source for this table is U.S. Department of Commerce National Climatic Data Center, Climatic Wind Data for the United States from 1930-1996, *available at* http://www5.ncdc.noaa.gov/documentlibrary/pdf/wind1996.pdf.

## Average Wind Speed

|  | **Detroit** | **Grand Rapids** | **Lansing** |
|---|---|---|---|
| **Spring Season** |  |  |  |
| March | 12 mph | 11 mph | 12 mph |
| April | 12 mph | 11 mph | 12 mph |
| May | 10 mph | 11 mph | 10 mph |
| **Fall Season** |  |  |  |
| August | 8 mph | 8 mph | 8 mph |
| September | 9 mph | 8 mph | 9 mph |
| October | 10 mph | 9 mph | 10 mph |

10. The above data indicate clearly that with respect to precipitation (including snow), temperature, and wind, the fall is far preferable to the spring for tennis in the lower peninsula of Michigan.

Respectfully submitted,

Poonam Kumar

Sworn to before me this 11th day of April 2007

Shirley A. Noland
Notary Public State of Michigan
Washtenaw County
Expires: 2/22/09

12

UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF MICHIGAN

COMMUNITIES FOR EQUITY, ET AL.,

*PLAINTIFFS,*                :

v.                                                 No. 1:98CV479

:

MICHIGAN HIGH SCHOOL ATHLETIC ASSOCIATION, INC.,

*DEFENDANT.*

:

### AFFIDAVIT OF RAFAT RIZK

RAFAT S. RIZK, being duly sworn, deposes and says:

1. I am a Clinical Assistant Professor in the Department of Internal Medicine at the University of Michigan Medical School. I am the father of, and appear in this action as next friend to, M.R., a 15-year old girl who is a freshman at Ann Arbor Huron High School, in Ann Arbor, Michigan. I submit this affidavit in support of the motion of the Michigan High School Tennis Coaches' Association and several parents, including myself, for intervention and other relief.

2. M.R. is a member of the Huron varsity tennis team. If the girls' tennis season switches to the spring, she will be detrimentally affected, because the spring is an inferior season for tennis in Michigan.

3. In M.R.'s case, the detriment would be particularly severe, because she suffers from Raynaud's Disease. This is a disorder that mostly affects girls and young women; it is rare in males. Those afflicted with Raynaud's, like M.R., are especially susceptible to cold and numbness in various parts of their bodies in response to cold temperatures. They suffer pain, numbness, swelling, tingling, and throbbing of the fingers and toes. The symptoms can reduce the hand's

functions and are aggravated by stress. Sources on Raynaud's include National Institute of Arthritis and Musculoskeletal and Skin Diseases, *Questions and Answers About Raynaud's Phenomenon*, <http://www.niams.nih.gov/hi/ topics/raynaud/ar125 fs.htm>; MayoClinic.com, *Raynaud's disease*, <http://www. mayoclinic. com/health/raynauds-disease/DS00433>; K.M. Brown, et al., *The Effects of Stress, Anxiety, and Outdoor Temperature on the Frequency and Severity of Raynaud's Attacks: The Raynaud's Treatment Study*, 24 JOURNAL OF BEHAVIORAL MEDICINE 137 (2001).

4. Tennis, of course, requires good footwork, manual dexterity, and good feel for the racquet. Especially because of the impact of Raynaud's on fingers and toes, therefore, the ability to play tennis of those who suffer from it is severely impaired by cold weather, and their well-being is impaired by playing tennis in the cold.

5. An additional factor making a spring season particularly unfortunate for a tennis player who suffers from Raynaud's is that tryouts come at the beginning of the season, when the weather is coldest. Accordingly, she would be seriously prejudiced in her attempt to make her team and to to get a good placement on it.

6. M.R. is an excellent tennis player. As a freshman, she played third doubles on the varsity of a very large high school, a team that won the State Division I championship -- and she and her partner won the state championship in her flight. And yet I do not believe she is a candidate for a college scholarship. I do not believe she is likely to be offered a scholarship, and even if she is offered one it probably will not be at a college that she is interested in attending. She is an excellent student with high academic expectations (both her parents are professionals), and I expect that she will choose a college primarily on the basis of academics. She loves playing

2

tennis, and she knows that doing so may help her get into a good college, but she is not motivated at all by the prospect of a college scholarship – and neither does that prospect play any role in the considerable support we have given for years to here tennis playing.

4. I understand that the trial in this case was held in 2001, when M.R. was in the fourth grade. I did not know of this litigation until the fall 2006 tennis season. We lived in Illinois until June 2006, when we moved to Michigan. Until several months before that, I did not anticipate that we would live in Michigan; we moved here so that I could take up my present position at the University of Michigan.

Respectfully submitted,

Rafat S. Rizk

Sworn to before me this _11th_ day
of April 2007

*Mary gay Yorum*

State of _Michigan_
County of _Washtenaw_
On this _11th_ day of _April_
before me personally appeared
_Rafat S. Rizk_
to me known to be the person who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.
SEAL (signed) _Mary gay Yorum_
                                    Notary Public

3