UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COMMUNITIES FOR EQUITY,
 *et al.*,

                Plaintiffs,

v.

MICHIGAN HIGH SCHOOL
ATHLETIC ASSOCIATION.

                Defendant.

_____/

Case No. 1:98-CV-479

Hon. Richard Alan Enslen

**OPINION**

**When the game is complete, the loser should not complain about the rules.**

This matter is before the Court on the Petition for Attorneys' Fees[1] and Costs of Plaintiffs

Communities for Equity, which represents a class of more than 150,000 interscholastic female

---

[1]As a threshold matter, the stylistic difference between "attorneys' fees," "attorney's fees," "attorneys fees," and "attorney fees" is trivial. Nevertheless, this donnish question of style and spelling was thoroughly discussed by the Sixth Circuit Court of Appeals in *Stallworth v. Greater Cleveland Reg'l Transit Auth.*, 105 F. 3d 252, 253 n.1 (6th Cir. 1997). The *Stallworth* Court concluded that the proper form is that which appears in the governing statute, which in that case was "attorney fees." *Id.* The Sixth Circuit, however, has not spoken with consistency. In *Ridder v. City of Springfield*, 109 F.3d 288, 290 n.1 (6th Cir. 1997), the statutory form "attorneys' fees" was rejected, as was the reasoning in *Stallworth*, in favor of "attorney fees" based on a "survey[] [of] the landscape." Pursuant to Sixth Circuit Rule 206(c), since a conflict exists regarding what spelling is appropriate, *Stallworth* controls. *See Ruth v. Comcast Corp.*, No. 3:04-CV-332, 2006 WL 2792179, at *1 n.1 (S.D. Ohio Sept. 26, 2006). Unfortunately, *Stallworth* does not resolve the issue for this Court. Federal Rule of Civil Procedure 11 speaks of "attorney's fees," 42 U.S.C. § 1988 refers to "attorneys' fees," Michigan's Elliot-Larsen Civil Rights Act inconsistently refers to both "attorney's fees" and "attorney fees," and the Consent Decree entered into by the parties refers to "attorneys' fees." The Court will use the form "attorneys' fees" since it is utilized in both § 1988 and the Elliot-Larsen Civil Rights Act, albeit inconsistently. Variations from this form appearing in other sources are left unchanged.

athletes in the State of Michigan.[2]  The Petition, which was filed over six years ago, is adamantly

opposed by Defendant Michigan High School Athletic Association ("MHSAA").[3]  The court has

substantial discretion in determining whether to conduct an evidentiary hearing on a fee petition.

*Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392,

1402 (6th Cir. 1995).  An evidentiary hearing is required only if the court is unable to resolve

material factual disputes based on the affidavits and written documentation submitted.  *Id.* (citing

authorities).  In this case, the disputes between the parties can be readily resolved based on the

materials submitted, which include Plaintiffs' Petition, MHSAA's Response and Request for Limited

Discovery, MHSAA's Response, MHSAA's Addendum to its Response, Plaintiffs' Reply,[4]

Plaintiffs' Supplemental Petition, MHSAA's Supplemental Response, Plaintiffs' Supplemental

Reply, MHSAA's Expert Report, Plaintiffs' Expert Report, MHSAA's Supplemental Expert Report,[5]

and a plethora of exhibits, affidavits, and declarations comprising approximately 1,500 pages.  The

---

[2]The class representatives are Diane Madsen, on behalf of her minor daughters, and Jay Roberts-Eveland, on behalf of her minor daughter.

[3]Plaintiffs originally also sued members of MHSAA's representative council and its executive director.  MHSAA is the only remaining Defendant pursuant to the Court's Order of October 2, 2001.

[4]MHSAA has moved to strike 16 of the 19 exhibits submitted with Plaintiffs' Reply. (Dkt. No. 633.)  MHSAA argues these exhibits do not rebut MHSAA's Response.  The Court denies MHSAA's motion because all of the exhibits rebut statements made or authorities cited in MHSAA's Response.  Moreover, the majority of MHSAA's objections teeter on the brink of frivolousness.

[5]The Court has scrutinized the three expert reports but accords no deference to the legal conclusions contained therein.  As can be expected, MHSAA's expert agrees with all of MHSAA's objections and Plaintiffs' expert agrees with all of the requested attorneys' fees and costs.  To avoid unnecessary confusion, the Court seldom distinguishes between arguments advanced by a party's expert rather than the party itself since all expert conclusions have been adopted by reference.

extensive filings have provided the parties with ample opportunity to express their views and the Court discerns no reason for oral argument.  *See* W.D. Mich. LCivR 7.3(d).

The United States Supreme Court has repeatedly cautioned that resolution of fee petitions should not become a "second major litigation."  *See, Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 609 (2001) (citation omitted); *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791 (1989); *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).  This optimistic hope has gone unfulfilled as defendants routinely oppose fee petitions brought by prevailing plaintiffs on every conceivable ground.  The case *sub judice* is no exception. After laborious review, the Court concludes that Plaintiffs are entitled to the bulk of the requested attorneys' fees and costs.  This is a classic case of the obdurate defendant who digs in its heels while litigating the merits of an action, loses, and then cries "foul" when asked to pay the resulting attorneys' fees and costs.

## I. BACKGROUND

Plaintiffs filed this action in 1998 and alleged that MHSAA discriminates against female interscholastic athletics by: (1) sanctioning too few female sports; (2) scheduling female but not male sports in nontraditional seasons; (3) scheduling female sports to shorter athletic seasons than male sports; (4) assigning female sports to inferior and non-regulation facilities for MHSAA tournaments; and (5) providing female sports with less publicity and promotion than male sports during MHSAA tournaments.  After three years of vigorous litigation on the merits, the parties entered into mediation.

As a result of mediation, the parties entered into a Consent Decree settling all issues except the scheduling of interscholastic athletic seasons.  Among other concessions, MHSAA agreed to

sanction two more female sports, move the female basketball finals to the Breslin Center at Michigan State University, renovate the state tournament softball facility, assign female softball tournaments only to sites with regulation fastpitch fields, assign girls' volleyball tournaments only to sites that meet the standards of the National Federation of State High School Associations, equalize promotion and publicity (including equal coverage of MHSAA tournament finals on television), and promote the same number of holes of golf for both genders.  The Consent Decree includes an attorneys' fees and costs provision which states:

> [E]ntitlement of plaintiffs to attorneys' fees and costs as "prevailing parties" will be determined solely upon a final judicial resolution of which "parties prevailed" on the issues actually tried.  If plaintiffs are "prevailing parties," they shall be entitled to petition the Court for their attorneys' fees and costs for work on all issues in this case, whether tried or settled.

(Consent Decree 2.)

The parties thereafter went to trial on the scheduling of seasons issue.  Plaintiffs alleged that MHSAA's scheduling of six female sports but no male sports in nontraditional seasons violates: (1) Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 *et seq.*); (2) the Equal Protection Clause of the 14th Amendment to the United States Constitution; and (3) Michigan's Elliott-Larsen Civil Rights Act (Mich. Comp. Laws § 37.2101 *et seq.*).  Trial began on September 24, 2001 and lasted two weeks.  The Court found in favor of Plaintiffs on all three legal theories and held that MHSAA discriminated in the scheduling of all six contested sports.  *Communities for Equity v. MHSAA*, 178 F. Supp. 2d 805, 862 (W.D. Mich. 2001), *aff'd*, 459 F.3d 676 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 1912 (2007).

Plaintiffs' Fee Petition, which was timely filed on January 30, 2002, seeks $5,155,136.05. This amount is comprised of $5,023,991.25 in attorneys' fees and $131,144.80 in costs. (Suppl. Reply 25.) A breakdown of the fees and costs by firm is as follows:

| Law Firm and Headquarters | Requested Fees | Requested Costs |
|---|---|---|
| Equity Legal (comprised solely of Kristen Galles) Alexandria, Virginia | $3,405,519.00 | $89,510.86 |
| National Women's Law Center ("NWLC") Washington, D.C. | $998,870.00 | $22,823.34 |
| DLA Piper (formerly known as Piper Rudnick) Decentralized | $225,912.00 | $11,074.67 |
| Steptoe & Johnson Washington, D.C. | $216,815.25 | $6,127.67 |
| Pinsky, Smith, Fayette & Kennedy Grand Rapids, Michigan | $176,875.00 | $1,608.26 |

MHSAA argues Plaintiffs are entitled to $0.00 in fees and costs, but alternatively to no more than $917,955.00, which roughly equals 17% of Plaintiffs' request.[6] (Suppl. Resp. 7–8.) Because MHSAA objects to almost every facet of Plaintiffs' Petition, limited judicial resources prevent discussion of each objection individually. Accordingly, the Court discusses the most significant categories of objections. Any objection not explicitly discussed is hereby denied.

## II. LEGAL STANDARDS

Attorneys' fees are not awarded in federal civil actions except where a federal statute or court rule departs from "the American Rule that litigants in most circumstances must bear their own costs." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 565 (1991); *see also*

---

[6]MHSAA would likely agree to a slightly higher amount than $917,955.00 because this figure did not take into account the fees and costs incurred for researching and drafting Plaintiffs' Supplemental Reply.

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 271 (1975). Rule 54(d) of the Federal Rules of Civil Procedure provides that attorneys' fees and costs can be awarded to the prevailing party of a case in limited circumstances. To be eligible for fees, besides complying with procedural requirements, a party must file a petition for attorneys' fees and "specify the judgment and the statute, rule, or other grounds entitling the movant to the award." Fed. R. Civ. P. 54(d)(2)(B)(ii). In this case, Plaintiffs are the prevailing party under the plain terms of the Consent Decree because they prevailed "on the issue[] actually tried."[7] (Consent Decree 2.) Plaintiffs are also the prevailing party under Title IX, *see* 42 U.S.C. § 1988(b), and the Elliott-Larsen Civil Rights Act. *See* Mich. Comp. Laws §§ 37.2801–2802. "Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). The party claiming any item of cost or disbursement must, through an affidavit, verify the amount and indicate that the services for which fees have been charged were actually and necessarily performed. 28 U.S.C. § 1924.

---

[7]The most important consideration at the heart of a fee request is the degree of success. *See Hensley*, 461 U.S. at 435. MHSAA argues that although Plaintiffs succeeded in getting some seasons changed, Plaintiffs did not succeed in obtaining the same schedule for both genders, monetary relief, or any relief against members of MHSAA's representative council or its executive director. (Suppl. Resp. 14.) In reported decisions alone, Plaintiffs defeated MHSAA's 1998 Motions to Dismiss and for Summary Judgment, *Communities for Equity v. MHSAA*, 26 F. Supp. 2d 1001 (W.D. Mich. 1998); achieved class certification, *Communities for Equity v. MHSAA*, 192 F.R.D. 568 (W.D. Mich. 1999); defeated MHSAA's Second Motions to Dismiss and for Summary Judgment, *Communities for Equity v. MHSAA*, 80 F. Supp. 2d 729 (W.D. Mich. 2000); succeeded in significant Motions in Limine, *Communities for Equity v. MHSAA*, 137 F. Supp. 2d 910 (W.D. Mich. 2001); and won on the liability issues tried by the Court, *Communities for Equity v. MHSAA*, 178 F. Supp. 2d 805 (W.D. Mich. 2001). Plaintiffs were also extremely successful at the appellate level. Accordingly, MHSAA's argument is wholly without merit.

The primary concern when awarding attorneys' fees is that the fees are reasonable. *See Blum v. Stenson*, 465 U.S. 886, 893 (1984). Fees are calculated utilizing the "lodestar" method, which was explained by the United States Supreme Court in *Hensley*:

> The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.
>
> The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." S. Rep. No. 94-1011, p. 6 (1976). Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Copeland v. Marshall*, 205 U.S. App. D.C. 390, 401, 641 F.2d 880, 891 (1980) (en banc) (emphasis in original).

461 U.S. at 433–34. As an alternative to line-by-line reduction, the propriety of simple across-the-board reductions by a certain percentage has been recognized by the Sixth Circuit as an appropriate mechanism for penalizing duplication and other billing problems. *See Coulter v. Tennessee*, 805 F.2d 146, 152 (6th Cir. 1986). Where fee documentation is voluminous, some courts have found it impractical to engage in a precise line-by-line analysis and favor across-the-board reductions. *See, e.g., Loranger v. Stierheim*, 10 F.3d 776, 783 (11th Cir. 1994).

Reasonable hourly rates typically equate to the customary rates charged by local attorneys of comparable experience and expertise. *Hadix v. Johnson*, 65 F.3d 532, 536 (6th Cir. 1995).

Certain cases create an exception to this general rule and allow higher rates to be recouped by an "out-of-town specialist." *Id.* Regarding this exception, the Sixth Circuit has counseled:

> When fees are sought for an out-of-town specialist, courts must determine (1) whether hiring the out-of-town specialist was reasonable in the first instance, and (2) whether the rates sought by the out-of-town specialist are reasonable for an attorney of his or her degree of skill, experience, and reputation. *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768–69 (7th Cir. 1982); *Maceira v. Pagan*, 698 F.2d 38, 40 (1st Cir. 1983). A corollary of this rule is that judges may question the reasonableness of an out-of-town attorney's billing rate if there is reason to believe that competent counsel was readily available locally at a lower charge or rate. *Chrapliwy*, 670 F.2d at 769.

*Id.* at 535.

Adjudication of the lodestar fee does not end the analysis mandated by the Supreme Court. While there is a "strong presumption" that the lodestar fee is reasonable, pertinent circumstances may warrant an adjustment either upward or downward. *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan*, 46 F.3d at 1401–02. Factors pertinent to setting and adjusting the lodestar fee was specified long ago by the Fifth Circuit Court of Appeals in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). The *Johnson* factors have now become part of the settled law of lodestar analysis under both Supreme Court and Sixth Circuit decisions. These factors include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Blanchard v. Bergeron*, 489 U.S. 87, 91 n.5 (1989) (citing *Johnson*); *Paschal v. Flagstar Bank*, 297 F.3d 431, 435 (6th Cir. 2002). The *Johnson* factors are a "useful catalog" to consider when

exercising statutory discretion, *Paschal*, 297 F.3d at 435 (citation omitted), but are not die-hard requirements.[8]  *Crosby v. Bowater Inc. Ret. Plan for Salaried Employees of Great N. Paper, Inc.*, 262 F. Supp. 2d 804, 811 (W.D. Mich. 2003), rev'd on other grounds, No. 03-1808, 2004 WL 5389834 (6th Cir. 2004).

## III. ANALYSIS

### A. Local Counsel and Out-of-Town Specialists

MHSAA's most financially significant objection questions whether Plaintiffs' numerous out-of-town specialists were reasonably necessary to the litigation and thus deserving of non-local attorneys' rates.  To resolve this issue, two questions must be answered:  (1) whether competent counsel was available locally, and (2) whether the rates requested by Plaintiffs' counsel are reasonable based on the applicable market.

#### 1. Competent Counsel

Prosecuting the discrimination suffered by Plaintiffs presented challenges far more complex than those found in typical civil rights actions.  To succeed in this case, Plaintiffs needed counsel with: (1) knowledge of the application of Title IX and the Equal Protection Clause to athletics programs; (2) the capability to devote significant human and capital resources for the life of the case; (3) a willingness to take on a powerful local entity with significant financial resources and widespread public support;[9] (4) a willingness to tolerate a high degree of risk with recovery

---

[8]Based on MHSAA's objections, a discussion of each *Johnson* factor is implicitly integrated into the Court's analysis.  The Court determines that the final award need not be adjusted upward or downward as it adequately compensates counsel while not producing a windfall.

[9]In 1998, MHSAA enjoyed a reputation for vehement litigation tactics.  MHSAA's website formerly boasted it had "prevailed in every legal action for 20 years."  MHSAA, *Local*

contingent on success; (5) litigation experience; and (6) competency to manage a large class action lawsuit.

A "good-faith effort to find local counsel is all that is necessary, lest the meticulous generation of a comprehensive log of inquires deter plaintiffs from bringing worthy discrimination suits, frustrating the rationale for statutes enabling private civil rights suits." *See Mathur v. Bd. of Trs. of S. Ill. Univ.*, 317 F.3d 738, 744 (7th Cir. 2003) (citation omitted). Courts must be mindful to not impose impossible burdens on potential plaintiffs in cases "of great national concern" by requiring plaintiffs to look for the proverbial needle in the haystack before retaining counsel ideally qualified to handle their case. *See Northcross v. Bd. of Educ. of Memphis City Sch.*, 611 F.2d 624, 634 (6th Cir. 1979). The "representation of important national concerns [must] not depend upon the charitable instincts of a few generous attorneys." *Id.* at 638.

After the class representatives contacted Kristen Galles, she began searching for a local attorney to serve as lead counsel.[10]   In early 1998, Galles spent at least 9.9 hours in furtherance of this search.  After searching Martindale-Hubble entries, Galles contacted the only attorney in Michigan claiming expertise in Title IX—Jean King of Ann Arbor.[11]  According to Galles, King—"a woman not known for backing down from a fight"—"refused to take the case because she believed

---

*Litigation Now National Issue* (2002), http://www.mhsaa.com/news/equity.html.

[10]Galles' role in the beginning of the case was unknown to her, although she knew an attorney with Title IX expertise would be essential to success.  "I knew that either NWLC or I would have to participate in the litigation in some way.  However, at the beginning of the case, I did not know whether I would be involved as lead counsel or merely as advisory counsel." (Galles' Suppl. Decl. ¶ 91.)

[11]A class representative had previously contacted King herself.  King turned down this request for representation.

MHSAA had too much money and power for the case to be winnable." (Galles' Suppl. Decl. ¶ 6; *see also* King's Aff. ¶¶ 11–13; Madsen's Decl. ¶¶ 32–34.) Galles also contacted, but to no avail, the American Civil Liberties Union, National Organization of Women, Grand Rapids Bar Association, Western Michigan Women's Bar Association, the American Association of University Women, and three other local attorneys. Thus, Plaintiffs argue, no competent local attorneys were willing to lead this case.[12] Galles eventually convinced Rhett Pinsky, a local attorney at a small law firm, to serve as local counsel, *see* W.D. Mich. LCivR 83.1(f), although he was unwilling to assume a lead role. (Pinsky's Suppl. Decl. ¶ 3.)

MHSAA protests Galles' search for "local counsel" by way of semantics. MHSAA argues Galles never actually searched for local Michigan counsel to lead the case, but rather searched only for secondary counsel in Michigan to assist her as lead counsel. MHSAA bases this argument on Galles' use of the adjective "local" in billing descriptions. "Local" has two connotations, the first of which designates close geographic proximity, *see Webster's New Universal Unabridged Dictionary* 1127 (Barnes & Noble 2003), and the second which describes counsel who has a secondary role to out-of-town lead counsel. *See* W.D. Mich. LCivR 83.1(f) ("The Court may . . . require any attorney whose office is a great distance from the courthouse to retain local counsel. Local counsel . . . shall have both the authority and responsibility for the conduct of the case should lead counsel be unavailable . . . .)

---

[12]MHSAA confusingly interprets Galles' argument to mean she is "the only *competent* lawyer available to take this case." (Suppl. Resp. 11.) Plaintiffs, however, have never made this argument, rather that no Michigan attorneys possessed both (1) competency and (2) amenability to taking this case.

Read naturally in the context of Galles' billing records and based on a review of the organizations and attorneys she actually contacted, "local" indicates that she looked for *Michigan* attorneys to spearhead the case, not attorneys to take on a secondary role.  It was only after Plaintiffs concluded no competent local attorneys were willing to lead the case that Pinsky was hired as secondary counsel, as required by local rule.  MHSAA's argument for a contrary interpretation is disingenuously pedantic.  For example, in an affidavit submitted on behalf of MHSAA, the attorney affiant uses the word "local" to mean secondary counsel.  (*See* Mackraz's Aff. ¶ 9 (stating that "plaintiffs could have retained local counsel to represent their interests had they so chosen").)

To counter the assertion that no competent Michigan attorneys were available to lead the case, MHSAA presents an affidavit from one Michigan attorney, Frederick E. Mackraz, who claims he could have served as lead counsel.  *Cf. Guckenberger v. Boston Univ.*, 8 F. Supp. 2d 91, 104 (D. Mass. 1998) (denying out-of-state counsel rates because the plaintiffs only made a cursory search for Boston counsel and the defendants had submitted affidavits from several well-respected civil rights attorneys who averred they were competent to handle the litigation).  Mackraz avers:  "I was not approached by Plaintiffs . . . .  Had I been approached, I would have certainly investigated their claims . . . .  I would have given very serious consideration to representing their interests in this case pursuant to my standard fee agreement."  (Mackraz's Aff. ¶ 8.)

Mackraz's affidavit, however, fails to demonstrate his competency and ability to lead this case.  He has failed to demonstrate he had the requisite time or financial resources to handle such a large case.  To this Court's knowledge, Mackraz has never handled, much less even worked on, a class action lawsuit.  There is a significant chance that Mackraz could not have even jumped through an initial hurdle of the case—being appointed as class counsel pursuant to Federal Rule of

Civil Procedure 23(g). Mackraz also did not possess any Title IX experience. Moreover, in 1998, he was an associate at Plunkett Cooney, a local firm which states that its "attorneys practice in the state and federal trial courts every day, defending lawsuits brought under Title VII, 42 U.S.C. § 1983 and state civil rights acts such as Michigan's Elliot Larsen Civil Rights Act." Plunkett Cooney, *Civil Rights*, http://www.plunkettcooney.com/practices-67.html (last visited Mar. 24, 2008). Plaintiffs needed counsel with experience prosecuting civil rights actions, not defending them. There was thus no reason to even consider attorneys at Plunkett Cooney. Simply put, Mackraz was not competent to lead Plaintiffs' case in 1998.

After reviewing MHSAA's acrimonious argument, it is quite telling that Mackraz is the *only* attorney MHSAA can present to the Court to counter Plaintiffs' compelling argument that Michigan attorneys lacked competency in this area of the law. The Court in no way means to discredit Mackraz's practice, but he was simply not qualified in 1998. MHSAA's argument magnifies the frustration Plaintiffs and Galles must have felt when searching for local counsel. Galles—acting without the benefit of hindsight that MHSAA has enjoyed in its search for potentially competent local counsel—surely felt that if Plaintiffs retained incompetent local counsel, it would prove fatal to their claims.

If Plaintiffs had kept searching for lead local counsel and receiving rejections after Galles contacted at least four local attorneys and five local organizations, which in the aggregate represent thousands of local attorneys, this meritorious suit may have been abandoned due to overwhelming frustration. The Court holds that expending almost ten hours in search of competent counsel and contacting thousands of attorneys—albeit indirectly—constitutes a good-faith effort to find local counsel. *See Gottlieb v. Barry*, 43 F.3d 474, 485 n.8 (10th Cir. 1994) (finding out-of-town counsel

reasonably necessary where there existed "neither a lawyer nor a firm in this town which could have devoted to this case the timely expertise, experience, and manpower" of the plaintiffs' counsel); *Avalon Cinema Corp. v. Thompson*, 689 F.2d 137, 140 (8th Cir. 1982) (concluding it is not always possible to find local counsel willing or able to undertake difficult and controversial civil rights litigation).  Thus, Plaintiffs appropriately ventured to find competent counsel outside Michigan.

### i.  Galles and Pinsky

It is undisputed that Galles is a leading Title IX and Equal Protection attorney with extensive litigation experience.  Based on this background, her previous work getting Plaintiffs' case off the ground, and the request of Plaintiffs, Galles assumed the role of lead counsel.[13]  Because at least one competent out-of-town attorney was necessary, Galles was surely reasonably employed and is properly compensated based on Washington, D.C. rates.  Pinsky was also necessary for all intents and purposes since a Michigan attorney was required as "local counsel."  *See* W.D. Mich. LCivR 83.1(f). The determination of whether the other out-of-town attorneys were reasonably employed is unfortunately not as straightforward.

### ii.  NWLC

MHSAA objects to counsel from NWLC when Galles was already acting as lead counsel and questions how many experts in Title IX and sex discrimination were necessary.  MHSAA claims the Department of Justice, which has considerable experience in Title IX and sex discrimination law, essentially assisted Plaintiffs as "co-counsel" because of its role as *amicus curiae*, which negates the need for perhaps any experts in these areas or at least NWLC.  (Def.'s Expert Report 3; *see also*

---

[13]"I agreed to become lead counsel because there was no one else to do it, because I knew that MHSAA was violating the law, and because Plaintiffs had begun to rely on me as the only person who told them they were right."  (Galles' Suppl. Decl. ¶ 95.)

Suppl. Resp. 6.)  While the assistance of *amicus curiae* no doubt benefits a plaintiff, it is not the *amicus curiae's* case to win.  Based on the relative strength of MHSAA and the number of hours necessary to successfully prosecute this case, Galles reasonably believed Plaintiffs would need more attorneys than just herself and Pinsky.  (*See* Reply 18.)  She therefore sought out NWLC for its highly-regarded expertise in Title IX and sex discrimination.  This was a reasonable decision given NWLC's experience and the number of attorneys it could provide to assist in this case.  NWLC is thus also entitled to Washington, D.C. rates.

Moreover, the number of attorneys employed by a party is not dispositive of whether an attorneys' fees award is reasonable.  The important consideration is the number of billable hours requested.  More than one attorney working on a case simply signals to the Court that it must be mindful of hours that are duplicative or excessive.  An analysis of the hours that are allegedly duplicative and excessive is discussed *infra*.

### iii.  DLA Piper

MHSAA objects to compensating DLA Piper counsel because neither Cohan nor Bohnenstengel had any Title IX, civil rights or sex discrimination experience when they were brought onto Plaintiffs' trial team.  (Def.'s Expert Report 3.)  These attorneys, however, were not added for Title IX or civil rights experience, but for trial experience.[14]  (Reply 10.)  Admittedly, the Court ordered the parties to pare down their cases considerably so that trial would not last longer

---

[14]Plaintiffs' female attorneys also ironically admit they "felt compelled to bring in a white male to succeed" due to defense counsel's alleged intimidation tactics against female counsel. (*See* Reply 10.)

than two weeks.[15]  As is the case with many parties facing this situation, Plaintiffs retained counsel with extensive trial experience and the proven ability to expeditiously and effectively condense Plaintiffs' case within the allotted time frame.  Nevertheless, even though it was reasonable to hire experienced trial counsel, this does not mean that local attorneys did not possess the same competency.  Plaintiffs have failed to convince the Court otherwise because no affidavits demonstrate a lack of local competent trial counsel.  The Court concludes that these out-of-town attorneys are only entitled to local rates and not rates based on the Washington, D.C. market.

### iv.  Steptoe & Johnson

Finally, MHSAA argues it is unreasonable to compensate counsel from Steptoe & Johnson—a firm known for, *inter alia*, its extensive attorneys' fees practice—to assist in fee petition litigation.  "Where necessary, fee petitioners may hire outside counsel to represent them in fee litigation.  The outside counsel may also recover reasonable attorneys fees." *Knop v. Johnson*, 712 F. Supp. 571, 592 (W.D. Mich. 1989) (citations omitted).  The vigor with which the defendant has litigated the fee issue may render the decision to retain outside fee counsel as reasonable. *Id.* MHSAA vigorously litigated the fee issue and retained an expert to file two substantial reports nitpicking the Fee Petition.  As such, it was entirely reasonable for Plaintiffs to hire outside fee counsel.

Plaintiffs have not convinced the Court, however, that competent fee counsel was unavailable locally.  Plaintiffs cite to a recent decision in the Eastern District of Michigan where lead counsel, Jenner & Block of Washington, D.C., was awarded Washington, D.C. attorneys' rates. *Entm't*

---

[15]Interestingly, while MHSAA objects to Plaintiffs' hiring of experienced trial counsel, MHSAA also added new trial counsel in 2001.

*Software Ass'n v. Granholm*, No. 05-73634, slip op. at 2 (E.D. Mich. July 6, 2006). In pertinent part, the court stated:

> The Court finds that it was reasonable for plaintiffs to hire Jenner & Block because of their expertise in the issues involved with this litigation, given their involvement in representing the video game industry in five other cases involving similar laws. *See Northcross v. Bd. of Educ. Of the Memphis City Schools*, 611 F.2d 624, 637 (6th Cir. 1979) (awarding fees for out-of-town civil rights attorneys because "the attorneys' intimate familiarity with the issues involved in [this] litigation undoubtedly meant that their time was far more productive in this area than would be that of a local attorney with less expertise"). While Detroit has its share of qualified First Amendment attorneys, Jenner & Block was uniquely qualified to head the litigation effort on behalf of plaintiffs due to their recent and on-going involvement in other jurisdictions, the compressed time-frame involved, and their sole access to deposition transcripts of expert witnesses in the Illinois case.

*Id.* Plaintiffs argue Steptoe & Johnson's recent and ongoing involvement in litigating similar issues in other jurisdictions made them uniquely qualified to represent Plaintiffs against MHSAA. (Suppl. Reply 21.) Plaintiffs do not provide enough information in this regard to compare this case to *Entertainment Software*. Accordingly, Plaintiffs will be compensated for the services of Steptoe & Johnson attorneys based on local rates and not Washington, D.C. rates.[16]

### 2. Reasonable Rates

Although some out-of-town counsel were reasonably employed, this does not necessarily mean the rates charged by said counsel are reasonable. Likewise, just because certain out-of-town counsel were not necessary, this does not necessarily mean the rates charged by said counsel are unreasonable.

---

[16]In awarding fees, the fee award is technically made to the party and not to counsel *per se*. *See Evans v. Jeff D.*, 475 U.S. 717, 756 (1986). The client's liability to the attorney is a separate contract matter. *See Gisbrecht v. Barnhart*, 535 U.S. 789, 806 (2002) (noting that "nothing prevents the attorney for the prevailing party from gaining additional fees, pursuant to contract, from his own client") (citation omitted).

> [I]f the client needs to go to a different city to find [a] specialist, he will expect to pay the rate prevailing in that city.  In such a case, there is no basis for concluding that the specialist's ordinary rate is unreasonably high.  If one wishes to be literal, the "prevailing" rate "in the community" for work performed by an outside specialist . . . is most likely to be that outside specialist's ordinary rate.  If the courts (without cause) award fees at less than that rate, they will tend to prevent those in smaller communities from obtaining the experienced legal counsel they may need, contrary to the policy behind awards of attorneys' fees to prevailing parties.

*Maceira*, 698 F.2d at 40 (citations omitted).  The issue is not, as MHSAA argues, whether Plaintiffs hired the "best" attorneys.  Even the "best" attorneys may charge reasonable rates.  Once a party has demonstrated lack of local competent counsel, the party need not begin searching for "cheap" out-of-state counsel.  Such a requirement would indubitably discourage plaintiffs with worthy claims from pursuing them because instead of searching for the proverbial needle in a (local) haystack, plaintiffs would be saddled with the more onerous burden of searching for the needle in a (national) hayfield.

Each attorney representing Plaintiffs must be scrutinized.  All attorneys request compensation based on current market rates to compensate for the almost ten-year delay in payment.  Such a request is entirely equitable and in accord with firmly-established precedent.  *See Barnes v. City of Cincinnati*, 401 F.3d 729, 745 (6th Cir. 2005); *Ams. United For Separation of Church & State v. Sch. Dist. of the City of Grand Rapids*, 717 F. Supp. 488, 499 (W.D. Mich. 1989).  Plaintiffs' counsel additionally seek their customary rates, which likely represents the market value of the services provided.  *See Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 351 (6th Cir. 2000) (holding that "special need" for out-of-state specialists dictates compensation at counsel's customary rates); *Louisville Black Police Officers Org., Inc. v. City of Louisville*, 700 F.2d 268, 277–78 (6th Cir. 1983); *cf. Berry v. Sch. Dist. of the City of Benton Harbor*, 703 F. Supp. 1277, 1282–83 (W.D. Mich. 1986) ("Especially in cases involving particularly complex issues . . . [a] national market or a market

-18-

for a particular legal specialization may provide the appropriate market.") (citations omitted).  The

following rates represent the customary rate requested for each attorney based on the 2008 market:

| Attorney | Firm | Experience | Hourly Rate |
|---|---|---|---|
| Rhett Pinsky | Pinsky, Smith, Fayette & Kennedy | 42 years | $250 |
| Kristen Galles | Equity Legal | 18 years | $390 |
| Marcia Greenberger | NWLC | 38 years | $440 |
| Neena Chaudhry | NWLC | 12 years | $390 |
| Barbara Burr | NWLC | 19 years | $390 |
| Jocelyn Samuels | NWLC | 26 years | $440 |
| Leslie Annexstein | NWLC | 16 years | $390 |
| Laura Duos | NWLC | Law Clerk | $125 |
| Beth Burkstrand-Reid | NWLC | Law Clerk | $125 |
| Dina Lassow | NWLC | 36 years | $440 |
| Andrea Kahn | NWLC | Law Clerk | $125 |
| Roger Warin | Steptoe & Johnson | 37 years | $440 |
| Lindsey Lang | Steptoe & Johnson | 26 years | $375 |
| Philip Cohan | DLA Piper | 42 years | $440 |
| Robin Bohnenstengel | DLA Piper | 13 years | $390 |

i.  Pinsky, Smith, Fayette & Kennedy (Local Rates for Local Counsel)

The Court first analyzes whether the rate requested by Pinsky is a reasonable local rate.

When deciding whether a Michigan attorney's rate is reasonable, the Court relies on a combination

of its own expertise and judgment, *see Garber v. Shiner Enters., Inc.*, No. 1:06-CV-646, 2007 WL

4557857, at *1 (W.D. Mich. Dec. 21, 2007), the State Bar of Michigan's "Economics of Law

Practice Survey," *see Citizens Ins. Co. of Am. v. KIC Chems., Inc.*, No. 1:04-CV-385, 2007 WL

-19-

2902213, at *5 (W.D. Mich. Oct. 1, 2007), other market surveys if necessary, *see id.* at *6, and the "attorney's normal billing rate [which] will often show the market value of the services provided." *Ams. United For Separation of Church & State*, 717 F. Supp. at 495.

MHSAA submitted an affidavit of Barbara A. Ruga—a long-standing Grand Rapids attorney—which sets forth her opinion regarding reasonable rates in the Western District of Michigan for attorneys and paralegals. (*See* Ruga's Aff. ¶ 1) Based on Ruga's market assessment, MHSAA argues Pinsky, Plaintiffs' sole Michigan attorney, should not be compensated more than $185 an hour. (Def.'s Expert Report 3, 11.) This suggested rate is too low based on the Court's knowledge of the current market. The Court accords little deference to Ruga's assessment of the legal market. The 2007 "Economics of Law Practice Survey" provides a much more authoritative summary of hourly billing rates. The following table compares the hourly rates of litigators at all Michigan firms to attorneys at Grand Rapids firms of any size:

|  | All Michigan Firms | Grand Rapids Firms |
|---|---|---|
| **Mean** | $200 | $298 |
| **Median** | $195 | $263 |
| **10th Percentile** | $150 | $230 |
| **25th Percentile** | $155 | $250 |
| **50th Percentile** | $195 | $263 |
| **75th Percentile** | $225 | $294 |
| **90th Percentile** | $275 | $400 |

*Economics of Law Practice Survey*, State Bar of Michigan (2007) (numbers are rounded to nearest dollar). As can be seen, Pinsky's customary rate is charged by the twenty-fifth percentile of Grand Rapids attorneys. Based on his 42 years of experience and the quality of his advocacy, this rate is

extremely reasonable.  Were Ruga's market analysis to be accepted, Pinsky would be compensated at a rate significantly lower than that charged by the bottom ten percent of Grand Rapids attorneys. While the Court is happy to consider the opinions of local attorneys such as Ruga, sometimes the rates suggested by such "long-standing" attorneys fail to consider the changes in the legal market and inflation that have occurred over the last decade.

Besides being reasonable based on the State Bar of Michigan's survey, Pinsky's rate is also reasonable based on local precedent.  In *Spurlock v. Rajt*, an Eastern District of Michigan court awarded an attorney with 16 years of experience $300 an hour based on the 2003 "Economics of Law Practice Survey."  No. 06-15251, 2008 WL 474082, at *2–3 (E.D. Mich. Feb. 15, 2008).  Noting that in 2003 such a rate represented the ninety-fifth percentile of all Michigan attorneys, the court nevertheless found such an award proper.  *Id.* at *2.  In this case, Pinsky has much more experience than the attorney in *Spurlock* and is requesting $50 less an hour.  Moreover, the rates at issue in *Spurlock* are over four years behind the current market.  Accordingly, Pinsky's billed hours are computed based on his $250 an hour rate.

          ii.  Equity Legal and NWLC (Washington, D.C. Rates for Out-of-Town Counsel)

The Court next turns to compensation requested by Galles and NWLC.  As aforesaid, rates based on the Washington, D.C. market are appropriate for both.  The Sixth Circuit has seemingly endorsed the use of the *Laffey* Matrix[17] to determine the reasonableness of rates for Washington, D.C. attorneys.  *See Adcock-Ladd*, 227 F.3d at 347 n.3 (noting that the *Laffey* Matrix is an "official

_____

[17] The *Laffey* Matrix was created in *Laffey v. Nw. Airlines, Inc.*, 746 F.2d 4 (D.C. Cir. 1984).

statement of market-supported reasonable attorney fee rates" for Washington, D.C.).  The *Laffey*

Matrix for June 1, 2007 through May 31, 2008 is as follows:

| Experience Level | Hourly Rate |
|---|---|
| 20+ years | $440 |
| 11–19 years | $390 |
| 8–10 years | $315 |
| 4–7 years | $255 |
| 1–3 years | $215 |
| Paralegals & Law Clerks | $125 |

United States Attorneys's Office for the District of Columbia, *Laffey* Matrix 2003–2008,

http://www.usdoj.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_7.html (last visited Mar. 24,

2008).  For almost two decades, courts have relied on the *Laffey* Matrix—or a variation of it—as

evidence of reasonable rates for attorneys in Washington, D.C.  *See, e.g., Covington v. District of*

*Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995); *Save Our Cumberland Mountains, Inc. v. Hodel*,

857 F.2d 1516, 1525 (D.C. Cir. 1988) (en banc); *Smith v. District of Columbia*, 466 F. Supp. 2d 151,

156 (D.D.C. 2006).

MHSAA objects to any presumptive market rate associated with Galles because she is a solo-

practitioner and employs no support staff.  (Resp. 13.)  Solo practitioners with no support staff,

MHSAA argues, traditionally charge less than attorneys working with other attorneys at a law firm

with support staff.  For example, if a market rate of $175 an hour is appropriate for attorneys

comparable to Galles, MHSAA argues she only is worth $150 an hour.  (*Id.*; *see also* Ruga's Aff.

¶¶ 5–6.)  The Court finds this argument baseless due to lack of authority or compelling evidence.

Accordingly, the Court awards Plaintiffs' fees for the services of Galles and NWLC attorneys at their requested rates since they are in accord with the *Laffey* Matrix.

          iii.  DLA Piper and Steptoe & Johnson (Local Rates for Out-of-Town Counsel)

Determining appropriate rates for DLA Piper and Steptoe & Johnson attorneys presents more of a challenge than Plaintiffs' other attorneys since they are out-of-town attorneys but only entitled to local rates.  Although counsel are only entitled to local rates, it is notable that they are requesting rates based on the *Laffey* Matrix as opposed to their customary rates, which are higher.  Plaintiffs' counsel hoped "this litigation decision [would] reduce the potential of even more rancorous litigation over fees and result in a quicker realization of the fee award."  (Suppl. Pet. 8.)  By all accounts, MHSAA was no less rancorous in fighting almost every dollar Plaintiffs requested in attorneys' fees.

MHSAA objects to any compensation flowing to DLA Piper counsel because the attorneys originally stated they were appearing *pro bono*.  (*See* Resp. 8–9.)  This argument can be summarily dismissed.  Courts are instructed to avoid "decreasing reasonable fees because the attorneys conducted the litigation more as an act of pro bono publico than as an effort at securing a large monetary return."  *Blum*, 465 U.S. at 895 (quoting *Stanford Daily v. Zurcher*, 64 F.R.D. 680, 681 (N.D. Cal. 1974)).  Thus, the Court will not prohibit reasonable fees just because attorneys were willing to volunteer their time without charging a fee.

Based on the 2007 "Economics of Law Practice Survey," Warin and Cohan's requested rates of $440 an hour are above the ninetieth percentile of Grand Rapids litigators, Bohnenstengel's requested rate of $390 an hour is just below the ninetieth percentile, and Lang's requested rate of $375 an hour is a little further below the ninetieth percentile.  *See Economics of Law Practice*

*Survey*, State Bar of Michigan (2007).  Based on the impressive resumes of these four attorneys,

extensive experience, and high quality briefing and documentation, the Court is satisfied that they

are all well-above the ninetieth percentile of Grand Rapids litigators and deserve compensation at

the top of the local market.

> [They] are nationally recognized experts in a complex field of federal practice.  They
> are by no means the "median" member of the bar, and their hourly rates should be
> adjusted upward to reflect both their specialization and the extremely high quality of
> the representation they provided to the plaintiff class.  Such an adjustment is not
> simply reasonable, it is mandated by equity and fairness.

*Knop*, 712 F. Supp. 583.  Other compensation surveys compel the same conclusion.  For example,

the National Law Journal's 2007 survey concludes that top rates for partners in the reporting

Michigan firms ranged between $530 to $625 an hour, with most partners averaging $400 an hour.

*See A Nationwide Sampling of Law Firm Billing Rates*, Nat'l L. J., Dec. 10, 2007, at B2, B4.

Accordingly, the Court finds that counsel's requested rates are reasonable based on the local market.

*See Citizens Ins. Co. of Am.*, 2007 WL 2902213, at *6 (citing *Yamanouchi Pharm. Co. v. Danbury

Pharmacal, Inc.*, 51 F. Supp. 2d 302, 305 (S.D.N.Y. 1999) (finding that counsel's rates need only

be "ball-park reasonable").[18]

## B. Improper Staffing

MHSAA argues Plaintiffs' counsel were improperly staffed on assignments and performed

clerical work that should have been performed by paralegals.  (Resp. 13 n.4, 15–17; Def.'s Suppl.

Expert Report 24–25.)  Statutes conferring attorneys' fees on prevailing parties are "not designed

as a form of economic relief to improve the financial lot of attorneys, nor were they intended to

---

[18]Although MHSAA does not voice much objection to the requested rates of paralegals
and law clerks relative to the rates requested by attorneys, the Court finds that all such rates are
reasonable based on the applicable market.

replicate exactly the fee an attorney could earn through a private fee arrangement with his client."

*Coulter*, 805 F.2d at 149 n.4 (quoting *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986).

> Nor do [courts] approve the wasteful use of highly skilled and highly priced talent for matters easily delegable to non-professionals or less experienced associates. Routine tasks, if performed by senior partners in large firms, should not be billed at their usual rates. A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn.

*Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983). The Supreme Court of Oklahoma has identified a useful list of common tasks performed by paralegals, including interviewing clients and witnesses, drafting pleadings and other documents, researching legal issues, researching public records, preparing discovery requests and responses, scheduling depositions, preparing notices and subpoenas, summarizing depositions and other discovery responses, coordinating and managing document production, organizing pleadings and trial exhibits, preparing witness and exhibit lists, preparing trial notebooks, preparing for the attendance of witnesses at trial, and assisting attorneys at trial. *See Taylor v. Chubb Group of Ins. Cos.*, 874 P.2d 806, 809 (Okla. 1994).

MHSAA concludes that approximately 2,600 hours billed by Plaintiffs' counsel should have instead been performed by paralegals. These tasks include legal research (700 hours), factual research (175 hours), scheduling depositions (55 hours), compiling witness and exhibit lists (150 hours), digesting depositions (100 hours), preparing trial notebooks (75 hours), organizing documents (350 hours), reviewing discovery responses and requests (450 hours), and managing document production (475 hours).[19] (Def.'s Expert Report 41.) MHSAA recommends compensating 75% of these hours at prevailing paralegal rates in Michigan, which it argues is $62.50 an hour. (*Id.*)

---

[19]All hours are approximate.

MHSAA also encourages the Court to use the rate for hiring temporary paralegals for calculation purposes, which it suggests is $25.00 an hour.  (*Id.*)

"[D]ecisions concerning which tasks an attorney performs and involving the allocation of personnel toward the efficient and effective completion of tasks will be left to the discretion of the professional unless the allocation is egregious."  *In re Seneca Oil Co.*, 65 B.R. 902, 911 (Bankr. W.D. Okla. 1986) (citation omitted).  "Competent plaintiffs' counsel are in the best position to determine how their time and the time of their associates can best be allocated."  *Muehler v. Land O'Lakes, Inc.*, 617 F. Supp. 1370, 1379 (D. Minn. 1985).  In *Roberts v. Nat'l Bank of Detroit*, 556 F. Supp. 724, 728 n.1 (E.D. Mich. 1983), the court concluded that experienced attorneys who complete routine work themselves should not be penalized if they are not involved in large law practices because they have no lower-level associates for delegation purposes.  The case at bar is sufficiently analogous to *Roberts*.  Thus, the Court will not decrease an attorney's rate even though the attorney performed tasks that could have been completed by a lower-level associate or paralegal, provided the attorney is not involved in a law firm where such delegation is possible.

In this case, the work characterized by MHSAA as "clerical"—most of which was performed by Galles who is a solo-practitioner and thus has no lower-level associates to delegate work to—was all reasonably necessary to the success of the litigation and was not unreasonable in duration.  After reviewing the time entries and affidavits, the Court finds no merit in MHSAA's contention that the legal research, factual research, digestion of depositions, and reviewing of discovery responses and requests should have been performed by paralegals.  Regarding the other tasks contested, although this work may have been more appropriate for lower-level associates or paralegals, a reduction in fees is inappropriate.  Most of this work was performed by Galles, however, some was completed

by other attorneys although it totals less than 90 hours.  Due to the significant number of hours rendered overall in this case, the Court accords discretion to the judgment of Plaintiffs' other attorneys in determining that it was reasonable to perform these tasks themselves.  By performing this work themselves, Plaintiffs' counsel were likely able to enhance their trial preparation because of their increased familiarity with the matters.  *See Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1583 (5th Cir. 1989) ("Though some of the work done by plaintiff's attorneys arguably could have been done by paralegals, the fact that this work was done by the attorneys will not diminish the fee award as their efforts enhanced trial preparation.").  Therefore, the Court concludes that the challenged staffing was proper.

### C.  Vague Billing Records

MHSAA argues the time records of Plaintiffs' counsel are impermissibly vague.  (Def.'s Suppl. Expert Report 13–21.)  The absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in hours or, in egregious cases, disallowance.  *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 952 (1st Cir. 1984).  Any ambiguities arising out of poor time records should be resolved against the fee applicant.  *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1142 (2d Cir. 1983).

MHSAA protests any compensation for approximately 17% of allegedly vague time entries.  (*See* Def.'s Expert Report 4, 19–26; Def.'s Suppl. Expert Report 13–21.)  A common objection is time billed for a telephone call or the drafting of a letter in which an attorney failed to state the subject matter discussed.  (*See* Def.'s Expert Report 20–26.)  Viewing MHSAA's argument broadly, it essentially argues counsel should not be compensated if a detailed memorandum was not drafted for every billable six-minute increment of time.  Had counsel provided this level of detail, however,

MHSAA would likely instead complain that counsel devoted far too many hours to billing and recommend substantial reductions. This typical argument espoused by losing defendants tries to place prevailing plaintiffs in a "Catch-22."

The Court finds merit in some of MHSAA's vagueness arguments due to overly ambiguous time records. Although a large majority of the time records are more detailed than necessary, which makes fee petition review much easier, the same cannot be said for all records. Accordingly, the Court imposes an across-the-board reduction of 10% on the total attorneys' fees award.[20] *Cf. Bronco's Entm't, Ltd. v. Charter Twp. of Van Buren*, Civil Action No. 99-70197, 2007 WL 2221406, at *1, 6 (E.D. Mich. July 31, 2007). In so holding, the Court seeks to penalize Plaintiffs' counsel not only for vagueness, but also for general over-billing problems such as excessiveness and duplicity. These over-billing problems are discussed separately *infra*, although further reductions in excess of 10% are not appropriate.

### D. Excessive Hours

MHSAA argues Plaintiffs' counsel billed an excessive amount of hours and that most hours, if not all, should not be compensated. (Def.'s Suppl. Expert Report 25–30.) "The aggregate time for their cause exceeds 9000 hours, despite the fact that they boast of being the Nation's most acclaimed and experienced litigators in civil rights suits of this nature, and in handling the legal issues involved." (Resp. 14.) This argument seems to suggest that great attorneys do not have to work hard. In the Court's experience, the exact opposite is true. Most great attorneys realize that to achieve a goal, much hard work and toil is necessary, especially when entering unchartered legal territory.

---

[20]This reduction is imposed after reducing fees for individual reductions. *See infra*.

-28-

MHSAA chastises numerous days where Plaintiffs' attorneys worked extremely long hours, most notably Galles.[21] (*See id.* at 6–7; Def.'s Expert Report 16.) Although discussing each day individually would prove tedious, the most seemingly egregious day is worth mentioning. On June 30, 1999, Galles billed 25.10 hours. This was the only day Galles billed in excess of 24 hours and she readily admits that during certain periods of time, she worked every waking minute and slept little. Further, she "worked all night several days in a row, so that [she] did not carefully pay attention to when one day ended and another began." (Galles' Suppl. Decl. ¶ 199.) The Court could punish Galles' inaccuracy, assuming it is inaccurate, but doing so is inequitable.

Contrary to the "normal" hours MHSAA implies all attorneys keep,[22] most attorneys have had to pull "all-nighters," as have many judges and their law clerks.[23] "It is certainly not unusual for attorneys to work long hours when they are litigating a complex matter." *Knop*, 712 F. Supp. at 579. Indeed, attorneys who have not experienced an unexpected event requiring such hours on the eve of a trial, proceeding, or transaction represent anomalies of the profession. (*See gen.* Kator's Decl. ¶¶ 5–7 (stating that as an attorney, long hours are common in complex cases).) Alternatively, even if Galles should have billed the hours she worked between 3:00 a.m. and 5:00 a.m. under July 1 instead

---

[21]MHSAA notes Galles billed "almost 700% more long days than any other attorney working on the Litigation." (Def.'s Expert Report 16.) As lead counsel, this should be expected.

[22]MHSAA also suggests that "[n]ot every event in an attorney's day is a billable one. . . . It has been estimated that a lawyer must generally spend three hours in the office to legitimately bill for two hours. Furthermore, an attorney working a lengthy day will inevitably be less efficient as the day progresses." (Def.'s Expert Report 16.)

[23]In this Court's chambers, for example, "working hours . . . exceed 50 hours a week as a general rule, and often total between 60 and 80 hours per week during trial terms." *Knop*, 712 F. Supp. at 579 n.5.

of June 30, for example, this does not change the total hours billed.  Either way, MHSAA's argument is void of merit.

MHSAA next takes issue with 640 hours Galles billed in initial research,[24] 346 hours of which were related to the "basic" legal issues and claims in the litigation.  (Def.'s Expert Report 3.) MHSAA fails to specify whether it objects to all the research hours or only those related to "basic" legal issues, although it would not be surprising if MHSAA believes an "expert" like Galles cannot justify a single hour of research.  If "a district court decides to eliminate hours of service adequately documented by the attorneys, it must identify those hours and articulate its reasons for their elimination."  *Northcross*, 611 F.2d at 637.  MHSAA summarily identifies the dates this alleged unnecessary research was performed.  (*See* Def.'s Supp. Expert Report 25–28.)  MHSAA fails, however, to adequately articulate why these hours should be eliminated and why the research was in fact unnecessary.  Conclusory statements do not suffice.  Thus, the Court is unable to find merit in the objection.

Alternatively, based on review of billed research hours, the amount of research undertaken by Plaintiffs' counsel was reasonable based on the circumstances of this case.  Title IX is a complex area of the law and contains relatively few reported decisions to guide practitioners.  *See Cohen v. Brown Univ.*, 101 F.3d 155, 169 (1st Cir. 1996) (recognizing "factual intricacies and legal complexities that characterize Title IX litigation").  Plaintiffs' counsel treaded new ground with their claims, including the applicability of Title IX to state high school athletic associations.  To tackle this issue required learning how MHSAA operates in order to establish that it controls and operates

---

[24]This research took place during the merit-phase of the case.  In later briefing, MHSAA chides many of the additional hours performed relating to the Fee Petition.

interscholastic athletics in Michigan and is thus a "state actor" subject to Plaintiffs' constitutional claims.  This involved review of over 30 years of MHSAA's handbooks, bulletins, representative council packets, and agendas.  It was not until the middle of this case that the Supreme Court resolved the "state actor" issue, which essentially adopted the position advocated for by Plaintiffs.  *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001).  Had less-experienced counsel handled this case, it would have greatly increased the number of hours that would have been billed.

Generally speaking, the number of overall hours expended was reasonably necessary due in large part to defense counsel's tactics.  "Defendants' counsel harassed plaintiffs and their counsel, intimidated the named plaintiffs and their minor children, were rude, uncooperative, and dilatory, and introduced a level of hostility into the litigation that vastly increased both the workload and the stress of prosecuting this case."  (Reply 2.)

> Defendants challenged plaintiffs at every turn, filing motion after motion.  Issues of capacity and standing, standards governing motions to compel and for protective orders, standards governing Rule 15 motions to amend, standards for interlocutory appeals, mandamus, rehearing *en banc*, and *certiorari*, the standards governing judicial disqualification, and several evidentiary issues were briefed in response to Defendants' obstructionist strategy.

(*Id.* at 9–10.)  MHSAA cannot choose to "litigate tenaciously and then be heard to complain about the time necessarily spent by plaintiff in response."  *City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986); *Knop*, 712 F. Supp. at 578.  The time required to litigate increases when the defendant bitterly contests the case, forcing the plaintiffs to win their victory from "rock to rock and from tree to tree."  *Lipsett v. Blanco*, 975 F.2d 934, 939 (1st Cir. 1992).  Accordingly, MHSAA must reap what it has sown.  The excessiveness objection is denied.

-31-

### E.  Duplicative Hours

MHSAA argues that Plaintiffs' counsel exhibited duplicative efforts.  (*See* Def.'s Expert Report 28–38; Def.'s Suppl. Expert Report 25–30.)  "[I]f the same task is performed by more than one lawyer, multiple compensation should be denied.  The more lawyers representing a side of the litigation, the greater the likelihood will be for duplication of services." *Ramos v. Lamm*, 713 F.2d 546, 554 (10th Cir. 1983).  MHSAA takes issue with approximately 1,100 hours that resulted from attorneys speaking to one another or meeting with the Department of Justice, such as telephone conferences, meetings, and emails. (Def.'s Export Report 27–28.) MHSAA also argues unnecessary staffing added over 200 billable hours to time billed for depositions as well as additional travel costs. (*Id.* at 6.)  MHSAA posits it was unnecessary for more than one attorney to be present at almost every event, including depositions, status conferences, pretrial conferences, and mediation.  (*See id.*)

In complex matters, it is standard practice for at least two attorneys to appear at most proceedings, along with paralegals or law clerks to assist with document handling.  If two attorneys are present at a deposition, for example, one can interrogate the witness while the other can consider what topics are not being adequately covered because of rude defense tactics, an evasive witness, or witnesses who claim not to remember.  Similarly, it is reasonable for all trial counsel to be present for mediation.  This case is an example of the success of such a staffing practice because mediation resulted in trial being reduced to a single issue.  This successful result indubitably saved time and attorneys' fees because a favorable result in mediation is almost always reached in a shorter period of time than it would take for the same result to be reached at trial.

After reviewing the numerous time entries associated with the hours at issue, the Court is satisfied that Plaintiffs' counsel did not overly duplicate or otherwise improperly staff proceedings

and assignments. Counsel reasonably consulted each other concerning pretrial orders, especially given the hostile and uncooperative nature of defense counsel, which eventually led the Court to order all parties to convene in the Court's jury room to produce a pretrial order. This also applies to the drafting of the final order of proof and court appearances where multiple attorneys were present.[25] Plaintiffs' expert provides a pointed summary of this issue:

> This case was lengthy, complex and vigorously contested. Undoubtedly, the defense tactics of rude, offensive behavior, foot dragging, dissembling and totally refusing to cooperate to move the case to a conclusion resulted in the expenditure of many more hours of lawyer time on the part of plaintiffs' counsel than would have been necessary if defense counsel had been more professional in their responsibilities to their client, to opposing counsel and to the Court.

(Pls.' Expert Report 15.) Accordingly, the Court finds that there was no duplication of attorney effort or unreasonable use of attorney time. *Cf. Knop*, 712 F. Supp. at 577–78 (finding billable time for eight attorneys, "one paralegal and a number of law clerks and law student interns" constituted reasonable staffing).

### F. Billing Fraud

MHSAA argues Galles fraudulently "padded" her billing records.[26] MHSAA tries to prove this allegation in two ways. First, MHSAA cites the approximately 3,400 aggregate hours Galles

---

[25]The most seemingly egregious of these appearances occurred at the final pretrial conference when all five trial counsel were present. Although such a practice would not be reasonable for every appearance in court, it was appropriate in this circumstance because all attorneys who are going to appear at trial should be at the final pretrial conference. This is a courtesy to the Court where, as here, new attorneys are appearing for the first time.

[26]Along these same lines, MHSAA argues Plaintiffs' counsel failed to use billing judgment and that substantial reductions are necessary to the hours claimed. (*See* Resp. 14; Def.'s Expert Report 41–43.) Plaintiffs' counsel claims to have exercised billing judgment to exclude over 1,000 billable hours. (*See* Reply 3 n.4.) Upon review of the time entries and affidavits, there is nothing to indicate that MHSAA's allegation has merit so it is therefore rejected.

billed in 1999 in this case, *Paton v. New Mexico Highlands Univ.*, No. 97-01360-JC (D.N.M.), and *Alston v. Va. High School League, Inc.*, No. CIV. A. 97-0095-C (W.D. Va.).[27]  When coupled with her community, special interest, and professional activities, MHSAA questions, "[w]hen did counsel have time to sleep, eat, conduct personal business and attend to administrative matters?" (Addendum to Resp. 4; *see also* Resp. 4.)  Given that Galles only took off 28 days in 1999, 3,400 hours roughly equates to billing 10 hours a workday.  These three cases—especially the case *sub judice*—were extremely time intensive and involved numerous deadlines.  Billing 3,400 hours is not facially unreasonable, especially given the amount of travel required.  The Court does not assume fraud based solely on the number of hours Galles billed.

MHSAA's expert also argues Galles consistently billed more time for attendance at trial, depositions, pretrial conferences, and other proceedings than the time records reflect the proceedings actually lasted.  (Def.'s Expert Report 4, 12–14.)  As any *trial* attorney knows, it is not acceptable to show up to court a second before the judge bangs the gavel to commence the proceeding.  Well-prepared attorneys are "working" before the start of any proceeding because they may need to assemble necessary materials, confer with clients or co-counsel, negotiate with opposing counsel, or engage in a plethora of other legitimate activities.  These incidentals performed in furtherance of the proceeding need not be billed under separate task descriptions from the underlying proceeding.

---

[27]In *Alston*, Galles was one of ten attorneys and claimed personal attorney's fees of $157,900.  MHSAA implies fraud by questioning why Galles is claiming much higher fees in this case and argues the two cases have virtually identical legal and factual issues.  (Resp. 19.)  MHSAA also argues "Galles has never sought or been awarded out-of-state billing rates in any of her other Title IX case [sic]."  (Suppl. Resp. 4; *see also* Resp. 9.)  MHSAA's position is untenable and irrelevant because the rates used to compensate Galles for her representation in *Alston*, local Virginia rates, has no bearing on the central question of whether competent counsel exists in Michigan.  Moreover, Galles worked many more hours in this case than she did in *Alston*.

"[C]ounsel . . . is not required to record in great detail how each minute of his time was expended."

*Knop*, 712 F. Supp. at 576 (quoting *Hensley*, 461 U.S. at 437 n.12); *cf. Lenihan v. City of New York*,

640 F. Supp. 822, 826 (S.D.N.Y. 1986) (finding that a seven hour entry for "general preparation"

or "preparation" followed by entries for a trial or preliminary hearing are "not so vague that the Court

is unable to assess their reasonableness"). On average, Galles worked approximately 45 minutes in

addition to the time it actually took to complete each proceeding. This time likely reflects dealing

with administrative matters such as those aforementioned. Upon review of the time records, the

Court does not find any abnormalities and thus rejects MHSAA's argument.

MHSAA's final argument alleging fraud concerns time billed for alleged telephone calls

between Galles and Pinsky which she billed for but he did not. (Def.'s Expert Report 14–15.)

MHSAA suggests such calls never actually took place and that Galles fabricated these records.

Galles contends that such discrepancies indicate only that the two attorneys exercised their billing

judgment independently. (Reply 13.) To the Court, these billing "discrepancies" do not raise

suspicion because it is well-known not every attorney exercises his or her billing discretion the same

way. The Court is satisfied that these billing records were contemporaneously compiled and

accurately reflect telephone calls that took place.

### G. Unreasonable Billing Increments and Block Billing

In its initial briefing, MHSAA contended some of Plaintiffs' attorneys billed in unreasonably

large billing increments, such as quarter-hour, half-hour, and full-hour increments. (Resp. 17; Def.'s

Expert Report 17; Def.'s Suppl. Expert Report 9–14.) This problem was allegedly compounded due

to block billing. Plaintiffs' attorneys countered that they billed in tenths of an hour and that "[t]he

fact that a task took sixty minutes does not imply . . . a sixty-minute billing increment, rounding up

to a full hour for tasks that took less time." (Reply 14.) MHSAA appears to concede in later briefing—albeit evasively—that Plaintiffs' counsel did not bill in such large increments. (*See* Suppl. Resp. 7.) If this concession was not meant to be made, the Court nevertheless finds that counsel did not bill in unreasonable increments and rejects any argument to the contrary.

### H. Travel Hours

MHSAA argues attorneys' fees are inappropriate for travel time, or alternatively only worthy of half of the attorney's billing rate. The thrust of MHSAA's argument is that traveling costs would not have been incurred had Plaintiffs not hired out-of-town counsel. (*See* Def.'s Expert Report 47–48; Def.'s Suppl. Expert Report 32, 36.) Plaintiffs' attorneys seek compensation for over 600 travel hours, most of which represents long-distance travel. MHSAA faults all counsel who traveled—besides Cohan—for not working while traveling and underscores they may have instead been sleeping or relaxing. (Def.'s Expert Report 7, 39.) Since it was reasonable to employ out-of-town counsel, it was necessary for counsel to travel to necessary proceedings and other matters. Travel time billed at an attorney's usual rate has routinely been awarded as a matter of course. *See, e.g., Wayne v. Village of Sebring*, 36 F.3d 517, 532 (6th Cir. 1994); *Citizens Ins. Co. of Am.*, 2007 WL 2902213, at *6. The Court makes no exception in this case and rejects MHSAA's argument to the contrary.

### I. "Fees for Fees" Hours

MHSAA argues Plaintiffs' counsel are requesting unreasonable "fees for fees" compensation. (Def.'s Suppl. Expert Report 33–34.) "It would be inconsistent with the purpose of the Fees Act to dilute a fees award by refusing to compensate the attorney for the time reasonably spent in establishing and negotiating his rightful claim to the fee." *Lund v. Affleck*, 587 F.2d 75, 77 (1st Cir.

1978). Nevertheless, prevailing parties do not have unlimited access to attorneys' fees. The Sixth Circuit, in *Coulter*, 805 F.2d at 151, provides guidance on "fees for fees" compensation. In the absence of unusual circumstances, the hours allowed for preparing and litigating a fee petition should not exceed 3% of the total hours in the underlying case if the issue is submitted on the briefing without a trial. *Id.* If there is a trial on the fee issue, the hours allowed should not exceed 5%. *Id.* The suggested 3% to 5% range represents a guideline and not an unbending rule. *See id.*

Plaintiffs' original Fee Petition and Bill of Costs[28] contained 96 hours spent on the Fee Petition, which represents approximately 2.2% of the hours billed in the underlying case. (Suppl. Reply 14–15.) MHSAA objects to these hours because Galles did not present contemporaneous time records to verify the hours claimed. Based on Galles' affidavit and the Fee Petition itself, numerous hours were undoubtably spent. Due to the lack of contemporaneous time records, however, the Court reduces these hours by 25% to 72 hours. *Cf. Hensley*, 461 U.S. at 428; *Kelley v. Metro. County Bd. of Educ.*, 773 F.2d 677, 683–84 (6th Cir. 1985).

The heart of MHSAA's "fees for fees" objection concerns the approximately 1,100 additional hours incurred after the original Petition was filed. "Supplemental attorneys' fees can be awarded in the same manner as attorneys' fees." *McCombs v. Meijer, Inc.*, 395 F.3d 346, 361 (6th Cir. 2005) (citation omitted). As Plaintiffs concede, since there was no trial on this issue, the total number of

---

[28]On August 13, 2002, the Court awarded $22,359.14 to Plaintiffs after reviewing their Bill of Costs. (*See* Dkt. No. 595.) MHSAA argues a "plethora of expenses previously awarded Plaintiffs with their Bill of Costs are again claimed in their present Fee Petition." (Resp. 23.) This equates to approximately $20,000 in costs. (*See* Def.'s Expert Report 9, 44–45.) Plaintiffs counter that the costs claimed in the Fee Petition are computed in two ways: (1) total costs if no costs were awarded pursuant to the Bill of Costs, and (2) a reduced cost amount taking into account any costs awarded on the Bill of Costs. (Reply 23–24.) Plaintiffs clearly are not entitled to a double recovery for incurred costs; however, Plaintiffs have correctly categorized the operation of their reimbursement request and thus MHSAA's objection is denied.

hours actually billed for fee litigation is roughly three times the 3% guideline recommended by the *Coulter* Court. (*See* Suppl. Reply 13.) Plaintiffs blame this departure from the guideline on MHSAA:

> MHSAA opposed the bill of costs; it filed unsuccessful motions for costs on behalf of the MHSAA individual defendants; it retained a hired gun[29] to search plaintiffs' records for entries that might provide fodder for its buckshot attack on CFE counsel personally and their legal services on behalf of the plaintiff class; it opposed a routine motion to exceed page limits; it moved to strike the majority of the exhibits to plaintiffs' Reply—exhibits necessary to meet its burden of proof in face of the allegations in MHSAA's Opposition.

(*Id.* at 15.) As Plaintiffs correctly note, "[t]his kind of procedural posturing wastes everyone's time and drives up the cost of the litigation. Yet Plaintiffs had no choice but to respond thoroughly." (Suppl. Pet. 5.)

The congressional purpose behind the Fees Act would be thwarted if losing defendants were able to dilute a fee award by forcing prevailing plaintiffs to devote uncompensated time to defend their legitimate fees. *See Weisenberger v. Huecker*, 593 F.2d 49, 53–54 (6th Cir. 1979). If the defendant vigorously objects to a fee petition with lengthy and specific objections, it is necessary for fee counsel to respond in kind. *Knop*, 712 F. Supp. at 592. MHSAA's vigorous objections, employment of an expert, and obstructionist tactics compel finding that the efforts of Plaintiffs' counsel was reasonably expended and absolutely necessary to secure their fee award. *Cf. Ams. United For Separation of Church & State*, 717 F. Supp. at 494–95 (awarding attorneys' fees for hours that constituted 15% of the total hours in the underlying case based on atypical circumstances). Accordingly, the Court finds that this departure from the 3% "fees for fees" guideline is proper.

---

[29]This "hired gun," MHSAA's expert, tremendously increased the workload of Plaintiffs' counsel and the Court while advancing few meritorious arguments.

**J.  Motion to Intervene Hours**

On July 13, 2007, the Court denied the Motion to Intervene of the Michigan High School
Tennis Coaches' Association and individual movants.  *See Communities for Equity v. MHSAA*, No.
1:98-CV-479, 2007 WL 2078753, at *5 (W.D. Mich. July 13, 2007).  On the same day, the Court
also denied the Motion to Intervene of certain coaches of female and male high school soccer teams
in the Upper Peninsula of Michigan and individual movants.  (*See* Dkt. No. 719.)  MHSAA argues
it should not have to pay for the approximately 180 hours devoted by Plaintiffs' counsel to defeating
these intervention efforts.  (Suppl. Resp. 4–5, 16; *see also* Def.'s Suppl. Expert Report 30–31.)

The Supreme Court has held that a prevailing party in a civil rights suit cannot recover
attorneys' fees and costs from an intervenor who has not violated the law, unless the intervention is
frivolous or unreasonable.  *Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 761 (1989).
The Supreme Court has not decided whether the prevailing party can recover fees and costs from the
defendant whose illegal conduct precipitated the intervention.  This issue was discussed in detail by
the district court in *Gratz v. Bollinger*:

> At least two circuit courts have interpreted *Zipes* as implying that the prevailing
> plaintiffs should bear the risk of incurring intervention-related costs as a result of
> filing a lawsuit and therefore have extended *Zipes* to a prevailing parties' [sic]
> request for intervention-related attorneys' fees from the losing defendant.  *See, e.g.,*
> *Rum Creek Coal Sales, Inc. v. Caperton*, 32 F.3d 169, 176–78 (4th Cir. 1994); *Bigby*
> *v. City of Chicago*, 927 F.2d 1426, 1428–29 (7th Cir. 1991).  In a case similar to the
> one now before this Court, the Fifth Circuit upheld the district court's refusal to
> award intervention-related fees and costs from the defendant's pocket because the
> plaintiffs "did not 'prevail' on this issue vis-a-vís [the defendant]."  *Hopwood v.*
> *Texas*, 236 F.3d 256, 280 (5th Cir. 2000).  As the court explained "[the defendant]
> remained neutral on the intervention issue.  In addition, the potential intervenors
> made clear . . . that the purpose of their intervention was to raise arguments and
> defenses that [the defendant] itself had no interest in raising."  *Id.*  The Fifth Circuit,
> however, declined to decide whether a prevailing party always should be barred from

-39-

> shifting to the defendant the costs associated with defending against an intervention.
> *Id.*

353 F. Supp. 2d 929, 940 (E.D. Mich. 2005).  In *Gratz*, the district court disallowed fees related to defeating intervention efforts by intervenors who asserted a ground the defendant "never asserted during the litigation."  *Id.*

This case is distinguishable from *Gratz*, *Hopwood*, and *Rum Creek Coal Sales*.  In this case, the unsuccessful intervenors asserted a ground which was previously abandoned by MHSAA after all appeals were exhausted.  Thus, Plaintiffs are the "prevailing party" on grounds advocated for by MHSAA.  These arguments were rejected when they were made by both MHSAA and the intervenors.  Moreover, the intervenors in *Gratz* tried to intervene during litigation on the merits by alleging that the defendant might not defend the case with the same vigor or on the same grounds as the intervenors would.  *See id.*  In this case, the interveners moved to intervene after the trial on the merits, at a point in time where there could be no argument that MHSAA had not vigorously represented the interveners' interests because MHSAA opposed any rescheduling of seasons.

If Plaintiffs' counsel had not argued against intervention, Plaintiffs would have potentially exposed themselves to a reversal of the victory already achieved.  This would have resulted in Plaintiffs thereafter "starting over" in hopes of winning another victory, which would have no doubt involved ample billable hours and numerous more years of litigation.  There can be no question that the time spent for anti-intervention efforts was reasonably necessary to the successful completion of the litigation.  *Cf. Del. Valley Citizens' Council for Clean Air*, 478 U.S. at 559–60 (recognizing that post-judgment services to enforce the relief obtained can be as important as securing the relief in the first instance).  Thus, the Court denies MHSAA's objection.

### K.  Public Relations Efforts

MHSAA objects to public relations efforts undertaken by Galles, such as hours billed when Galles spoke at a 2004 luncheon of federal bar practitioners in Grand Rapids; for conducting press conferences; and generally for media communications.  (Suppl. Resp. 4, 17; Def.'s Suppl. Expert Report 31–32.)  Galles billed 241 hours for these activities.  Media-related services are compensable under certain circumstances.  *See, e.g., Davis v. City & County of San Francisco*, 976 F.2d 1536, 1545 (9th Cir. 1992), vacated in part on other grounds, 984 F.2d 345 (9th Cir. 1993) (concluding that narrowly focused public relations efforts are compensable); *United States ex rel. Scott v. Metro. Health Corp.*, No. 1:02-CV-485, 2005 WL 3434830, at *8 n.15 (W.D. Mich. Dec. 13, 2005) (noting that the heavy use of the media by one party may render media services by the other party essential).  Moreover, "review of media statements by an opponent is proper investigation in connection with a suit."  *Metro. Health Corp.*, 2005 WL 3434830, at *8 n.15 (citation omitted).  The "fact that private lawyers may perform tasks other than legal services for their clients, with their consent and approval, does not justify foisting off such expenses on an adversary under the guise of reimbursable fees."  *Gratz*, 353 F. Supp. 2d at 941 (citation omitted).

In this case, Plaintiffs' counsel responded to media inquiries prompted by MHSAA's press releases and other attempts to publicly discredit Plaintiffs.  At times, it appeared Plaintiffs' cause was vilified by MHSAA, teachers, coaches, parents, the media, and the general public.  Attempting to sway public opinion in favor of Plaintiffs, however, is not compensable.  "The legitimate goals of litigation are almost always attained in a courtroom, not in the media."  *Rum Creek Coal Sales*, 31 F.3d at 176.  The Court will therefore deny compensation for the 241 hours expended relating to public relations.  *See Halderman by Halderman v. Pennhurst State Sch. & Hosp.*, 49 F.3d 939, 942

(3d Cir. 1995); *Hart v. Bourque*, 798 F.2d 519, 523 (1st Cir. 1986); *Gratz*, 353 F. Supp. 2d at 941–42.

### L.  *Amicus Curiae* Fees

MHSAA argues Plaintiffs' counsel should not recover attorneys' fees for services performed in connection with obtaining and later working with *amicus curiae*.  (Suppl. Resp. 16–17; Def.'s Suppl. Expert Report 30–31.)  MHSAA argues these services were not necessary to the litigation but admits no Sixth Circuit precedent exists supporting this view.  (Suppl. Resp. 17.)  MHSAA does cite, however, non-persuasive authority such as *Shakman v. Democratic Org. of Cook County*, 634 F. Supp. 895 (N.D. Ill. 1986), and *United States v. Washington*, 626 F. Supp. 1405 (W.D. Wash. 1985).  *Shakman* and *State of Washington* both concerned fees for an *amicus* brief prepared by the prevailing plaintiffs' counsel but filed in a different case.  *Shakman*, 634 F. Supp. at 900; *Washington*, 626 F. Supp. at 1514.  Since this issue is not present in the case at bar, these cases are not useful.

MHSAA's conduct is quite telling because even MHSAA solicited several groups as *amici* to argue in support of its position, apparently because it thought enlisting this help was a reasonable cost in defending this action.  Based on the significance of this case, it is inequitable to deny Plaintiffs' attorneys compensation for time spent responding to *amici* filings and soliciting *amici* in support of its own position.  These actions were reasonably necessary to the successful prosecution of this case and compensation shall be awarded in full.

### M.  Specific Cost Objections

The Sixth Circuit has counseled that there exists "two separate sources of authority to award out-of-pocket expenses.  Some expenses are included in the concept of attorney's fees, as 'incidental

and necessary expenses incurred in furnishing effective and competent representation,' and thus are authorized by [42 U.S.C.] section 1988." *Northcross*, 611 F.2d at 639 (citations omitted).  Costs under § 1920, however, "are on a different footing." *Id.*  Under § 1988, Sixth Circuit courts have consistently awarded "reasonable photocopying . . . and travel and telephone costs." *Id.*  The court will not "second-guess" an attorney's decision on how many copies are necessary.  *Id.* at 642.

### 1.  Photocopying and Printing

MHSAA argues against a reimbursement request of over $31,000 in photocopying and printing costs, most of which is attributable to Galles.  (Def.'s Suppl. Expert Report 35–36.)  Galles seeks reimbursement of in-house photocopying costs at 20 cents per page early in the case, 25 cents per page later in the case, and at actual cost when copies were made through Kinko's.  Galles seeks reimbursement at 10 cents a page for documents printed from her computer.  MHSAA recommends reducing photocopying and printing costs 75% for Galles and by a lesser amount for other attorneys. (*See* Def.'s Expert Report 46.)  MHSAA claims a very small percentage of these documents were admitted as exhibits at trial and that only costs incurred for those documents presented at trial are recoverable.  MHSAA further argues that most of the copies made of MHSAA's documents were not necessary as "Defendant offered Plaintiff [sic] access to *inspect* these documents."  (Resp. 22 (emphasis added); *see also* Def.'s Expert Report 9, 45–46.)  Federal Rule of Civil Procedure 34 provides any party the right "to inspect and copy" any documents within the broad scope of Rule 26(b).  Thus, Plaintiffs had the right to copy these documents.  MHSAA's argument is untenable because these copying costs are obviously reasonable litigation costs.  The Court concludes that all of the requested photocopying and printing costs are reasonable and should be reimbursed in full.

### 2.  Postage

MHSAA argues Plaintiffs' counsel cannot be reimbursed for postage costs because some courts have held that postage is ordinarily part of a firm's overhead.  *See, e.g., Altergott v. Modern Collection Techniques, Inc.*, 864 F. Supp. 778, 783 (N.D. Ill. 1994).  "Other courts have routinely allowed recovery for non-overhead expenses such as postage," such as this Court.  *Knop*, 712 F. Supp. at 590.  Accordingly, MHSAA's objection is denied.

### 3.  Telephone

MHSAA objects to certain telephone calls billed by NWLC counsel and suggests reducing these costs by 75%, which equals approximately $2,700.  MHSAA questions whether these costs were related to the litigation.  (Def.'s Expert Report 48.)  The Court is satisfied that these costs were related to the litigation, although greater detail in the cost records would have been preferred.

### 4.  Westlaw and Lexis Research

MHSAA objects to legal research costs incurred by counsel such as Westlaw and Lexis charges.  (Def.'s Suppl. Expert Report 35.)  The Third, Seventh, Tenth, and District of Columbia Circuit Courts of Appeal have all found these costs reasonable.  *See, e.g., Case v. Unified Sch. Dist. No. 233, Johnson County, Kan.*, 157 F.3d 1243, 1258 (10th Cir. 1998); *Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 570 (7th Cir. 1992).  "The logic of these cases is irrefutable."  *Citizens Ins. Co. of Am.*, 2007 WL 2902213, at *7 (citing *Crosby*, 262 F. Supp. 2d at 817)).  These costs are routinely billed to clients and are necessary in the studied practice of law.  *Cf. Northcross*, 611 F.2d at 638–39 (holding that costs which are routinely charged to clients and aid in the effective practice of law should be reimbursed.)  Therefore, these costs will be awarded to Plaintiffs.

**N.  Prejudgment Interest**

Michigan's Elliott-Larsen Civil Rights Act, which specifically defines "damages" to include attorneys' fees and costs, entitles counsel to interest on the attorneys' fees and costs award calculated from the filing date of the complaint.  *See* Mich. Comp. Laws § 600.6013; *Grow v. W.A. Thomas Co.*, 601 N.W.2d 426, 438 (Mich. App. 1999); *Schellenberg v. Rochester Mich. Lodge No. 2225*, 577 N.W.2d 163, 177 (Mich. App. 1998).  In this case, prejudgment interest accrues from the filing date of the Complaint in June 1998 until the issuance of the Court's Opinion and Judgment.  The Court leaves it to the parties to determine the applicable interest rate and amount of interest.[30]  *See* Mich. Comp. Laws § 600.6013.

**IV.  CONCLUSION**

For the reasons stated above, the Court reduces the requested attorneys' fee award of $5,023,991.25 through an across-the-board reduction for "fees for fees" hours claimed[31] and public relations hours claimed.[32]  After deducting these amounts, the fee award is $4,921,241.25.  This

---

[30]The prejudgment interest rate shall be "equal to 1% plus the average interest rate paid at auctions of 5-year United States treasury notes during the 6 months immediately preceding July 1 and January 1, as certified by the state treasurer, and compounded annually . . . ."  Mich. Comp. Laws § 600.6013(8).  It is noted that post-judgment interest, which is calculated from the date of the entry of the judgment, is controlled by 28 U.S.C. § 1961 since this case involved both federal and state law claims.  *See Reed v. Country Miss, Inc.*, Nos. 93-6370 & 94-5005, 1995 WL 348041, at *2 (6th Cir. June 8, 1995).

[31]This reduction equates to 24 hours at $390 an hour (Galles' rate), which is $9,360.00.

[32]This reduction equates to 241 hours at $390 an hour (Galles' rate), which is $93,390.00.

amount, however, is further reduced by a 10% across-the-board reduction for vagueness, excessiveness, and duplicity in the hours billed.[33]

Accordingly, the Court awards Plaintiffs Communities for Equity $4,429,117.13 in attorneys' fees and $131,144.80 in costs, for a total award of $4,560,261.93.  Prejudgment interest is payable on the total award and shall be calculated from the filing date of Plaintiffs' Complaint, with post-judgment interest payable from the date of this Opinion and Judgment.  A Judgment consistent with this Opinion shall issue.

                                          /s/ Richard Alan Enslen
DATED in Kalamazoo, MI:          RICHARD ALAN ENSLEN
        March 31, 2008                SENIOR UNITED STATES DISTRICT JUDGE

---

[33]To avoid a duplicative reduction, the Court reduces the award by 10% after making the "fees for fees" and public relations adjustments, as opposed to before.